UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BROOKLYN HEIGHTS ASSOCIATION, INC.,
BY ITS PRESIDENT JANE MCGROARTY,
FULTON FERRY LANDING ASSOCIATION, BY
ITS PRESIDENT JOAN ZIMMERMAN,
THE NEW YORK LANDMARKS
CONSERVANCY,

                 Plaintiffs,

          v.

NATIONAL PARK SERVICE
KENNETH SALAZAR,
Secretary of the U.S. Department of the Interior,
and
BROOKLYN BRIDGE PARK DEVELOPMENT
CORPORATION,

                 Defendants.

11 CV 0226 (ENV)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## PRELIMINARY INJUNCTION

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Attorneys for Plaintiffs

Dated: New York, New York
       March 8, 2011

# TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

I.  FULTON FERRY AND THE TOBACCO WAREHOUSE ......................... 3

    A.  Historical Background ......................................................................... 3

    B.  The Plan To Preserve The Tobacco Warehouse As Parkland ............... 4

II.  THE LWCFA GRANT ................................................................................. 5

III.  CLEAR INTENT TO USE THE TOBACCO WAREHOUSE FOR PUBLIC OUTDOOR RECREATIONAL ACTIVITY ................................... 7

    A.  A Vision For Brooklyn Bridge Park ..................................................... 7

    B.  Public Outdoor Recreational Use Of The Tobacco Warehouse ............ 8

IV.  SECRET PLAN TO PRIVATIZE THE TOBACCO WAREHOUSE ............ 8

V.  NPS'S SHAM REVIEW OF ITS 2008 DECISION .................................... 9

    A.  NPS Agrees To Review The 2008 Decision ......................................... 9

    B.  NPS Buckles To Political Pressure ..................................................... 10

ARGUMENT ............................................................................................................... 11

I.  LEGAL STANDARD ................................................................................. 11

II.  PLAINTIFFS CLEARLY SATISFY THE STANDARD .......................... 12

    A.  Likelihood Of Success On The Merits................................................. 12

        1.  Standard Of Review Under The APA ....................................... 12

        2.  Land And Water Conservation Act ........................................... 13

            a.  Background ................................................................... 13

            b.  The NPS Final Decision Violates The LWCFA ............ 14

            c.  NPS's *Ad Hoc* Final Decision Was Deliberately Erroneous ..................................................................... 16

        3.  National Historic Preservation Act ........................................... 17

            a.  Background ................................................................... 17

            b.  Section 106 Was Clearly Violated ................................ 18

        4.  National Environmental Policy Act ........................................... 20

**TABLE OF CONTENTS**
**[Continued]**

Page

a. Background ............................................................................ 20

b. NEPA Was Clearly Violated ...................................................... 20

B. Plaintiffs Are Being And Will Continue To Be Irreparably Harmed
Unless The *Status Quo Ante* Is Immediately Restored ........................................ 21

CONCLUSION ........................................................................................................... 23

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Beechwood Restorative Care Ctr. v. Thompson,*
   494 F. Supp. 2d 181 (W.D.N.Y. 2007) ................................................................. 14

*Brenntag Int'l Chems., Inc. v. Bank of India,*
   175 F.3d 245 (2d Cir. 1999) ................................................................................ 21

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,*
   786 F. Supp. 182 (E.D.N.Y. 1992) ...................................................................... 12

*Brown v. Giuliani,*
   158 F.R.D. 251 (E.D.N.Y. 1994) ......................................................................... 23

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ............................................................................................ 18

*Friends of the Shawangunks, Inc. v. Clark,*
   754 F.2d 446 (2d Cir. 1985) ............................................................................... 15

*Galusha v. N.Y. State Dep't of Envtl. Conservation,*
   27 F. Supp. 2d 117 (N.D.N.Y. 1998) .................................................................. 22

*Hall Cnty. Historical Soc'y v. Ga. Dep't of Transp.,*
   447 F. Supp. 741 (N.D. Ga. 1978) ...................................................................... 18

*Int'l Dairy Foods Ass'n v. Amestoy,*
   92 F.3d 67 (2d Cir. 1996) .................................................................................... 12

*LIH ex rel. LH v. N.Y. City Bd. of Educ.,*
   103 F. Supp. 2d 658 (E.D.N.Y. 2000) ................................................................ 22

*Md. Conservation Council, Inc. v. Gilchrist,*
   808 F.2d 1039 (4th Cir. 1986) ............................................................................ 21

*Mont. Wilderness Ass'n v. Fry,*
   310 F. Supp. 2d 1127 (D. Mont. 2004) .............................................................. 19

*Patriot-BSP City Ctr. II v. U.S. Bank Nat'l Ass'n,*
   715 F. Supp. 91 (D.D.C. 2010) ..................................................................... 21, 23

*Rathgaber v. Town of Oyster Bay,*
   492 F. Supp. 2d 130 (E.D.N.Y. 2007) ................................................................ 11

*Red Lion Broad. Co. v. FCC,*
   395 U.S. 367 (1969) ............................................................................................ 19

*Sanrio Co., Ltd. v. Ann Arctic, Inc.,*
   No. CV-98-1858, 1998 WL 766706 (E.D.N.Y. May 13, 1998) .......................... 12

## TABLE OF AUTHORITIES
### [Continued]

Page(s)

*Simmons v. Block*,
   782 F.2d 1545 (11th Cir. 1986) ........................................................................ 14

*WATCH v. Harris*,
   603 F.2d 310 (2d Cir. 1979) ....................................................................... 18, 19

### Statutes

16 U.S.C. § 460l-8(f)(3) ....................................................................... 13, 15, 16

16 U.S.C. § 470(b)(1)-(7) ................................................................................ 17

16 U.S.C. § 470f .......................................................................................... 17, 18

16 U.S.C. § 470s ................................................................................................ 18

42 U.S.C. § 4332(2)(C) ..................................................................................... 20

42 U.S.C. § 4332(C) .......................................................................................... 20

5 U.S.C. § 702 .................................................................................................... 12

5 U.S.C. § 706(2)(D) .................................................................................... 12, 18

### Regulations

36 C.F.R. § 59.3(b) ............................................................................................ 14

36 C.F.R. § 800.1(c) ......................................................................................... 20

36 C.F.R. § 800.16(l)(1) ................................................................................... 19

36 C.F.R. § 800.4(d)(2) .................................................................................... 19

36 C.F.R. §§ 800.2-.3 ...................................................................................... 18

36 C.F.R. §§ 800.2-.7 ...................................................................................... 18

40 C.F.R. § 1502.1 ............................................................................................ 20

## INTRODUCTION

Without this Court's intervention, two historic landmarks located on the Brooklyn waterfront will be taken from the public in violation of federal law, including the Land and Water Conservation Fund Act ("LWCFA"), the National Environmental Policy Act ("NEPA"), and the National Historic Preservation Act ("NHPA").  On February 14, 2011, the National Park Service ("NPS") issued an unprecedented *ad hoc* determination (the "Final Decision") that violated each of the above statutes, as well as its own rules and procedures, by permitting the removal of the Tobacco Warehouse and the Empire Stores from federally-protected parkland to private use without the processes required under the LWFCA, NEPA, and NHPA.

In 2001, the New York State Office of Parks, Recreation and Historic Preservation ("State Parks") applied for, and received, from NPS, a federal grant under the LWCFA to improve Empire Fulton Ferry State Park.  As part of this application, and as required by the LWCFA, State Parks submitted a map delineating the areas of the park that "shall not be converted to other than public outdoor recreation use but shall be maintained in public outdoor recreation in perpetuity."  The map's boundaries included the Tobacco Warehouse and Empire Stores, structures of unique historical significance.  State Parks twice certified, both in its 2001 grant application and its 2003 close-out documentation regarding the grant, that it had reviewed and affirmed the 6(f) Map's boundaries, and had been told verbally and in writing the significance of an LWCFA 6(f) boundary.

When the federal taxpayer funds were spent and the grant closed in 2003, NPS and State Parks were bound to protect the land within the 6(f) boundary in perpetuity unless, through the formal conversion procedure, NPS approved substitution of other outdoor recreational parkland of at least equal fair market value.  NPS was also required to comply with NEPA and NHPA before it removed the Tobacco Warehouse and Empire Stores from the protections of the 6(f)

Map.  NPS also violated its own regulations, which explicitly require that *before* approving any change in a 6(f) Map affecting historic structures such as the Tobacco Warehouse and Empire Stores, NPS must comply with Section 106 of the NHPA by consulting with State Parks' Historic Preservation Office ("SHPO") and affording the Advisory Council on Historic Preservation (the "Council"), an independent federal agency, a reasonable opportunity to comment on the undertaking.

Despite these mandatory statutory and procedural protections, a secret plan to privatize the Tobacco Warehouse began in 2008 at the behest of an influential private real estate developer.  Shortly thereafter, State Parks sent a letter to NPS falsely claiming that the Tobacco Warehouse was unsuitable for outdoor use, and requesting that NPS remove the Tobacco Warehouse and Empire Stores from the 6(f) Map.  With no attempt to satisfy federal law or address its own regulations, and with no apparent diligence, NPS agreed.  When Plaintiffs brought this action, NPS chose not to correct its mistake by reversing its decision and requiring compliance with federal law, and instead issued the Final Decision that again wholly failed to comply with NPS's legal obligations.

Plaintiffs need only show a likelihood of success on the merits that NPS's determination was taken without the procedures required by law, in violation of the Administrative Procedure Act ("APA").  There is no question that NPS's own policies required compliance with the LWCFA, NEPA, and NHPA, and there is no question that these procedures were not followed by NPS when it issued its Final Decision.  Instead, NPS engaged in an arbitrary and capricious *ad hoc* review, overruling its own staff's conclusions, deliberately preventing Plaintiffs from demonstrating the errors and mischaracterizations in the submissions from the City and State, and hastily issuing a predetermined and legally incorrect decision.

Plaintiffs are currently being irreparably harmed, as the Tobacco Warehouse has recently been closed to all park-goers, depriving Plaintiffs of their opportunity to enjoy it as a public outdoor recreational facility.   Further, if Plaintiffs' motion is denied, Plaintiffs will suffer additional irreparable harm, as there is no adequate remedy for the unlawful permanent alterations to these historically unique structures contemplated by Defendants.   Indeed, based on NPS's unlawful February 14, 2011, Final Decision, a spokesperson for Defendant Brooklyn Bridge Park Development Corporation ("BBPDC") has recently declared that BBPDC "is moving forward with development of the Tobacco Warehouse" into an enclosed private theater that clearly is not 6(f)-compliant.   There are even plans to immediately begin boring holes into the Tobacco Warehouse's foundation when a current standstill agreement expires on March 25, 2011.   And an RFP to develop Empire Stores for commercial use will be released soon, in spring 2011.   For all of these reasons, there is an urgent need for preliminary injunctive relief in this matter.

Therefore, Plaintiffs respectfully request that this Court enter a preliminary injunction, directing NPS to restore the Section 6(f) boundary map to include the Tobacco Warehouse and Empire Stores within the boundaries delineating federally protected outdoor recreational space, and enjoining BBPDC from taking any action changing the use of the Tobacco Warehouse and Empire Stores to other than federally-protected parkland.

## FACTUAL BACKGROUND

### I. FULTON FERRY AND THE TOBACCO WAREHOUSE

**A.**   **Historical Background**

The Tobacco Warehouse, originally built in the 1870's as a tobacco storage and customs-inspection center, sits within Fulton Ferry Park, just north of the Brooklyn Bridge, which is part of the greater Brooklyn Bridge Park.   Declaration of Jane McGroarty, dated March 8, 2011

("McGroarty Decl."), ¶ 2.  The Tobacco Warehouse is a walled-yet-outdoor structure, offering 25,000 square feet of outdoor space, which includes an 18,000 square-foot, column-free footprint.  *Id.*  Until it was recently gated off from the public, the Tobacco Warehouse was a popular destination for public and outdoor recreational activities and has hosted dozens of community and arts events.  *Id.*, ¶ 3.  With the Brooklyn Bridge looming overhead and breathtaking views of the Manhattan skyline, no other venue in Brooklyn provides the distinctive outdoor experience of the Tobacco Warehouse.  *Id.*, ¶ 3.

**B.    The Plan To Preserve The Tobacco Warehouse As Parkland**

Beginning in the 1960's, Plaintiffs have worked diligently, along with numerous other organizations and individuals, to protect the Fulton Ferry Landing area as a public park.  *Id.*, ¶ 4.  However, after Plaintiffs' initial efforts in the 1960's to save the Tobacco Warehouse were successful, years of neglect followed.  *Id.*  Trees and weeds sprouted inside while the space remained effectively abandoned, and in the 1980's a fire caused the Tobacco Warehouse's roof to collapse, leaving only the exterior walls and one main internal wall standing.  *Id.*  By May 1999, a private developer had put forth a *Plan for the D.U.M.B.O. Waterfront*, seeking to privatize the inter-bridge area of D.U.M.B.O., including the Empire Stores and the Tobacco Warehouse.  *Id.*, ¶ 5; Declaration of Jim Walden, dated March 8, 2011 ("Walden Decl."), Ex. A.  This plan was opposed by Plaintiffs and other community members, and Plaintiff Brooklyn Heights Association ("BHA"), in coordination with Plaintiff NY Landmarks Conservancy (and the Brooklyn Bridge Park Coalition), convinced the New York City Buildings Department and State Parks to abandon demolition of the Tobacco Warehouse.  McGroarty Decl., ¶ 6.  By October 1999, New York City had agreed to include the area between the Brooklyn and Manhattan Bridges, including the Tobacco Warehouse and Empire Stores, in its plans for Brooklyn Bridge Park.  *Id.*, ¶ 7.

The overall goals for Brooklyn Bridge Park were outlined in an Illustrative Master Plan ("IMP") that was prepared by the Brooklyn Bridge Park Development Corporation, dated September 2000, which set forth a multi-year public planning process that was transparent, inclusive, and comprehensive, into which Plaintiffs had significant input.  Declaration of Joan Zimmerman, Dated March 8, 2011 ("Zimm. Decl."), ¶ 2; Walden Decl., Ex. C.  In addition, the Brooklyn Bridge Park Provisions & Guidelines, drafted contemporaneously with the IMP, made clear that the Tobacco Warehouse would remain an integral part of the park.[1]  Walden Decl., Ex. D.  Funding for the IMP came through various funding sources, including monies from a federal grant pursuant to the LWCFA.  *Id.*, Ex. C; Zimm. Decl., ¶ 3.

## II. THE LWCFA GRANT

On or about October 18, 2001, State Parks sent a grant application for LWCFA funds to the Regional Director of NPS.  The items required by, and attached to, the application included: a "dated project boundary map,"[2] as well as a "pre-approval on-site inspection report" and a "project narrative."  Walden Decl., Ex. D.  The 6(f) Map submitted for federal funding of the park clearly included the Tobacco Warehouse and Empire Stores.  *Id.*  The other documents submitted with the application made clear that this was no accident.  For instance:

---

[1] The Brooklyn Bridge Park Provisions & Guidelines state, in relevant part:  "The walls of the Tobacco Warehouse Building are reinforced and restored to form a walled botanical garden within which small-scale ancillary uses would be permitted.  New [internal] structures will not extend above the height of the restored walls.  Public entrances should allow for the after-hours closing of the botanical garden . . . . The lawn in front of the Empire Stores and Tobacco Warehouse is extended south to the base of the Brooklyn Bridge tower.  Existing mature trees should be taken into consideration and sparingly added to.  The design of this area should have regard for creating and enhancing views underneath the Brooklyn Bridge."  Walden Decl., Ex. C at 27-28.

[2] This map is commonly referred to as a "6(f) Map," which refers to the specific section of the LWCFA that requires it.

- The application included an On-Site Inspection Report, which certified that State Parks had been "told (verbally or in writing) what a 6(f)(3) boundary is and the implications of conversion in use." *Id.* at Pre-approval On-Site Inspection Report. The On-Site Inspection Report, in turn, incorporated a map which emphasized, with hand-drawn arrows, that the Tobacco Warehouse is part of the park. *Id.* at Empire Fulton Ferry State Park- Cove Area Key to Site Photos.

- The project narrative specifically references the Tobacco Warehouse and Empire Stores as part of the Cove Area Restoration project, noting that "[t]he Empire Stores/Tobacco Warehouse complex was the subject of an historic structures report in 1990," and states that the project was necessary to protect the complex, which lies directly in front of the cove area, from water-frontage erosion. *Id.* at Project Description.

- The application also included a "Project Element/Cost Breakdown," which included costs for creating walkways between the Tobacco Warehouse and Empire Stores, irrigation around those structures, re-sloping of the adjacent land, electrical lines to supply power, and landscaping. *Id.* Project Element/Cost Breakdown, 17.

The December 2001 grant approval explicitly provided that the State and the Director of NPS "may mutually alter the area described in the project agreement and the signed and dated project boundary map," but *only* "[p]rior to the completion of [the] project." *Id.,* Ex. E. at Project Agreement General Provisions, 2.

On or about July 16, 2003, after the LWCFA funds were spent, Close-Out Documentation confirmed that "the 6(f)(3) boundary established in the pre-approval stage [has] been reaffirmed with the project sponsor" and that "the sponsor (State agencies or locals) [has] been told (verbally and in writing) what a 6(f)(3) boundary is and the implication of conversion in use." *Id.,* Ex. F at Final On Site Inspection Report, 1. These contemporaneous documents make clear that the Tobacco Warehouse and Empire Stores were part and parcel of the application and were to be preserved in perpetuity for public outdoor recreational use in return for the federal grant.

### III. CLEAR INTENT TO USE THE TOBACCO WAREHOUSE FOR PUBLIC OUTDOOR RECREATIONAL ACTIVITY

**A.    A Vision For Brooklyn Bridge Park**

In May 2002, before the LWCFA grant was closed, the State of New York and City of New York signed a Memorandum of Understanding ("MOU") for the development of the Brooklyn Bridge Park, which included plans to incorporate the Fulton Ferry Park within the broader Brooklyn Bridge Park. *Id.*, Ex. G; Zimm. Decl., ¶ 4. To that end, the State and City created BBPDC as a subsidiary of the Empire State Development Corporation, to take full control and responsibility for, *inter alia*, the development of Fulton Ferry Park. *Id.* According to the MOU, the park development would be "guided by the provisions contained in the" IMP and the process would include "extensive public input," including communication and coordination with "local community groups," such as Plaintiffs. Walden Decl., Ex. G at 4.

The MOU also required that the project be preserved as outdoor public parkland: "[T]he state-owned areas designated as open space . . . shall be afforded the protections of state law relating to the non-alienation of State park lands. The Tobacco Warehouse and lands of the existing Empire Fulton Ferry State Park shall remain under the jurisdiction of State Parks." *Id.* Arising from the MOU was a General Project Plan ("GPP"), adopted by the BBPDC on July 26, 2005, and affirmed as modified on January 18, 2006, which specifically differentiated park space from development parcels. *Id.*, Ex. H. Critically, the GPP did not identify the Tobacco Warehouse as a development parcel. *Id.* In addition, the BBPDC was responsible for issuing a final Environmental Impact Statement ("EIS") for Brooklyn Bridge Park in December 2005, which provided detail about various aspects of the park development project, including renovation, demolition, and alienation of various areas and structures. *Id.*, Ex. I. The EIS

specifically identified the Tobacco Warehouse as "open space" and "designated parkland." *Id.*, at Figure 1-16 and Figure 2-2.

**B.     Public Outdoor Recreational Use Of The Tobacco Warehouse**

As required by the LWCFA, and consistent with the IMP, MOU, and GPP, between 2002 and 2008, the Tobacco Warehouse was a protected park space used for outdoor recreational activities, including outdoor picnics, concerts, plays, shows, festivals, and dances.  Zimm. Decl., ¶ 5.  During this time, Empire Stores -- also protected park space -- was used as a central hub of park support and housed public restrooms, emergency services, and park coordination activities. *Id.*

Between 2004 and 2008, pursuant to a permit issued by State Parks, the Brooklyn Bridge Park Conservancy (the "BBP Conservancy") sponsored over 200 free programs in or immediately around the Tobacco Warehouse, which more than 200,000 people attended. *Id.*, ¶ 6. When not used for public programming by the BBP Conservancy, or a limited number of private events, the Tobacco Warehouse was often open to the general public, and enjoyed for strolling, walking, jogging, and sightseeing. *Id.*, ¶ 7.

**IV. SECRET PLAN TO PRIVATIZE THE TOBACCO WAREHOUSE**

Freedom of Information ("FOI") requests reveal that, beginning in October 2008, State Parks officials had numerous non-public communications with private interests regarding development of the Tobacco Warehouse. Zimm. Decl., ¶ 8; McGroarty Decl., ¶ 8.  These discussions culminated in a secret submission on November 5, 2008, by State Parks to NPS, requesting that NPS remove the Tobacco Warehouse and Empire Stores from the federally-protected portion of the 6(f) Map, claiming that their inclusion in the map was merely a mistake – first "discovered" years after the grant was spent and closed.  Walden Decl., Ex. J.  Not coincidentally, this removal would allow State Parks to pursue development of the Tobacco

Warehouse by private interests.  Zimm. Decl., ¶ 9.  This submission was not disclosed to the public, nor even to the Board of Defendant BBPDC, the entity with operational and developmental responsibilities for Fulton Ferry Park and the historic structures therein.

In its November 2008 submission, State Parks falsely claimed that "we can state that these former warehouse buildings are not suitable for nor used by the public for outdoor recreational opportunities in the park."  Walden Decl., Ex. J.  A mere visit to the Tobacco Warehouse or a simple internet search would have revealed that State Parks' claim was false.  Zimm. Decl., ¶ 10.  Nonetheless, in a letter dated December 12, 2008, NPS agreed to remove the Tobacco Warehouse and Empire Stores from the boundaries of the federally-protected area, without following the required regulations and procedures for conversion of parkland under the LWCFA.  Walden Decl., Ex. K.  The December 2008 decision was based solely on State Parks' misrepresentation that the Tobacco Warehouse was unsuitable for outdoor public recreation.[3]

Soon after learning of this secret plan, Plaintiff BHA sent a letter, dated July 15, 2010, explaining the broad outdoor uses for which community members had enjoyed the Tobacco Warehouse for years, and requesting that NPS direct State Parks to restore the 6(f) Map to include the historic structure.  Id., Ex. L.  After six months had passed with no action by NPS, Plaintiffs commenced this action on January 13, 2011.  See Complaint, Docket #1.

## V.  NPS'S SHAM REVIEW OF ITS 2008 DECISION

### A.    NPS Agrees To Review The 2008 Decision

Only when faced with this litigation did NPS agree to review its 2008 decision.  And, on or about January 20, 2011, NPS internally concluded that "the 2008 correction of the boundary

---

[3]  The December 12, 2008 Letter states, in relevant part: "[S]ince . . . these former warehouses are not suitable for recreational use by the public . . . . [we] concur with your request to revise the boundary."  Walden Decl., Ex. K.

in 2008 [sic] to exclude the Tobacco Warehouse was not justified." Walden Decl., Ex. M at 1. NPS further concluded that "outdoor recreation activities have taken place at the [Tobacco Warehouse] since prior to project completion in 2003, and that the inclusion of the Tobacco Warehouse site in the original Section 6(f) boundary was appropriate." *Id.*

Based on its own findings, on January 21, 2011, NPS requested a two-week extension to oppose Plaintiffs' TRO, representing to both Plaintiffs and this Court that "this lawsuit as a whole" may be "render[ed] moot."[4] *See,* First Motion for Extension of Time, Docket #4. Accordingly, on January 26, 2011, Plaintiffs agreed to withdraw their motion for a TRO. *Letter to the Honorable Eric N. Vitaliano*, Docket #8.

## B.  NPS Buckles To Political Pressure

On January 20, 2011, when the City of New York discovered that NPS decided to restore the Tobacco Warehouse to the 6(f) Map (thereby thwarting its plans for private development), the City sprung into action. At the highest levels, City officials lobbied both NPS and the Department of Interior ("DOI"). Shortly thereafter, NPS agreed to give the City (through State Parks) time to make an additional submission.

On January 31, 2011, NPS accepted the first submission from State Parks, which included a letter forwarded by State Parks but written by the New York City Department of Parks & Recreation ("City Parks") (the "January 31 Submission"). Walden Decl., Ex. N. In the January 31 Submission, State Parks simply abandoned its 2008 rationale for de-parking the Tobacco Warehouse and invented a new argument, put forth by City Parks: the inclusion of the Tobacco Warehouse was a mistake because there were numerous *unsuccessful* proposals prior to

---

4  NPS's request was a reflection of the understanding that it would partially reverse its 2008 decision and restore the Tobacco Warehouse, but not Empire Stores, to federal protection.

10

the LWCFA grant to use the Tobacco Warehouse for non-6(f) uses. *Id.* Plaintiffs then submitted a response on February 2, 2011. *Id.*, Ex. O.

On February 9, 2011, Plaintiffs learned that City and State Parks had been afforded at least <u>four</u> additional chances to respond (the "Additional Submissions"), including a "follow-up conference call with the City and State officials . . . on Monday, February 7 to ensure that NPS had a complete record of matters relating to th[e] [LWCF] project grant." Walden Decl., Ex. S; *See also, Id.,* Exs. P, Q, R. NPS then swiftly closed its administrative record, without providing Plaintiffs their previously-promised equal opportunity to respond.

On Monday, February 14, 2011, NPS hastily issued its Final Decision which affirmed -- on new grounds -- the removal of the Tobacco Warehouse and the Empire Stores from the 6(f) map. *Id.*, Ex. S. When NPS decided to quickly close the administrative record, it precluded Plaintiffs from an equal voice in the review process. Indeed, this review process was disproportionate on its face: City and State Parks submitted a total of <u>four</u> written submissions and even participated in a conference call while Plaintiffs were only afforded the opportunity to submit one, brief response.

Thereafter, Plaintiffs filed their Amended Complaint and now bring this motion for preliminary injunctive relief.

## ARGUMENT

## I. LEGAL STANDARD

A preliminary injunction is a form of equitable relief designed to maintain the status quo during the pendency of an action. *See, e.g., Rathgaber v. Town of Oyster Bay*, 492 F. Supp. 2d 130, 138 (E.D.N.Y. 2007) ("Generally, the purpose of a preliminary injunction is to preserve the status of the parties until a determination on the merits of the plaintiffs' claims can be made."). The status quo for years, and up until recently, has been the public's enjoyment and use of the

Tobacco Warehouse as an outdoor recreational facility as discussed above. Indeed, the Tobacco Warehouse is a historic landmark with protected outdoor parkland status and, absent the required conversion procedures under the LWCFA, must remain protected for public outdoor recreation.

In the Second Circuit, a plaintiff seeking a preliminary injunction to stay governmental action taken pursuant to a regulatory scheme must demonstrate irreparable harm, and "a likelihood of success on the merits." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996).

## II. PLAINTIFFS CLEARLY SATISFY THE STANDARD

### A.    Likelihood Of Success On The Merits

To demonstrate a likelihood of success on the merits, Plaintiffs "need not show that success is an absolute certainty," but instead need only show "that the probability of his prevailing is better than fifty percent." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 786 F. Supp. 182, 191 (E.D.N.Y. 1992) (citation omitted), *rev'd on other grounds*, 973 F.2d 1033 (2d Cir. 1992); *see also Sanrio Co., Ltd. v. Ann Arctic, Inc.*, No. CV-98-1858, 1998 WL 766706, at *7 (E.D.N.Y. May 13, 1998) (granting preliminary injunction where plaintiff "demonstrated a greater than fifty percent likelihood that it can prove its" claims). Thus, the Court here need not fully adjudicate the merits of Plaintiffs' claims to grant the requested interim injunctive relief.

### 1.    Standard Of Review Under The APA

The Administrative Procedure Act ("APA") entitles a person who is adversely affected or aggrieved by agency action to judicial review of that action. 5 U.S.C. § 702. The reviewing court must overturn agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *Id.* § 706(2)(A), or "without observance of procedure required by law." *Id.* § 706(2)(D).

2.      **Land And Water Conservation Act**

a.      **Background**

The LWCFA was established by Congress in 1965 to have a lasting effect on the supply of recreation sites and facilities by requiring that sites assisted be added permanently to the "national recreation estate."[5]   Section 6(f)(3) of the LWCFA states unequivocally that grant-assisted properties are to remain forever available for "public outdoor recreation uses," or be replaced by lands of equal market value and recreation usefulness.  16 U.S.C. § 460l-8(f)(3).

States receiving LWCFA grant assistance must first create a Section 6(f) Map that clearly delineates the area that is protected by the statute's prohibition on conversion to non-outdoor recreational use.  *See* Walden Decl., Ex. T at 6-3.  If a state later wishes to convert a property that has received LWCF monies and has thus become part of the "recreation estate" – *i.e.*, by removing the protected park designation under Section 6(f)(3) – it must submit a written application for conversion.  Under the LWCFA, "[t]he Secretary shall approve [the removal of parkland from the protected map] <u>only</u> if he finds it to be in accord with the then existing comprehensive statewide outdoor recreation plan and <u>only</u> upon such conditions as he deems necessary to assure the substitution of other recreation properties of at least <u>equal fair market value</u> and of reasonably equivalent <u>usefulness</u> and <u>location</u>."  16 U.S.C. § 460l-8(f)(3) (emphasis added).

To meet this burden, the state must demonstrate each of the following:  (1) "[a]ll practical alternatives to the conversion have been evaluated"; (2) "[t]he fair market value of the property to be converted has been established and the property proposed for substitution is of at least

---

5   See National Park Service, State LWCF,
    http://www.nps.gov/ncrc/programs/lwcf/protect.html (last visited Mar. 7, 2011).

equal fair market value as established by an approved appraisal"; (3) "[t]he property proposed for replacement is of reasonably equivalent usefulness and location as that being converted"; and (4) "[t]he property proposed for substitution meets the eligibility requirements."   36 C.F.R. § 59.3(b).

### b.   The NPS Final Decision Violates The LWCFA

An agency's failure to comply with its own regulations constitutes arbitrary and capricious conduct.  *See Beechwood Restorative Care Ctr. v. Thompson*, 494 F. Supp. 2d 181, 202 (W.D.N.Y. 2007); *accord Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct.").  NPS failed to even address this procedure at all, ignoring every one of the LWCFA's requirements:

- **No Evaluation of All Practical Alternatives**:  NPS made no attempt to find any, much less all, practical alternatives to removing the Tobacco Warehouse or Empire Stores from the 6(f) Map.

- **No Approved Appraisal of The Fair Market Value**:  There was no discussion, much less the proper establishment by an approved appraisal, of the fair market value of the Tobacco Warehouse or Empire Stores.

- **No Proposed Replacement Property of Reasonably Equivalent Usefulness and Location**:  No other property has been proposed, mooting any debate over equivalence; and

- **No Ensuring That The Substituted Property Meets the LWCFA Eligibility Requirements**:  Again, no substitute property was even offered, and NPS ignored the clear and overwhelming evidence that the Tobacco Warehouse was in use as a public outdoor facility and that its inclusion in the 6(f) Map was no oversight.

The sole reason NPS offered in avoiding each of these mandatory requirements is that inclusion of the Tobacco Warehouse and Empire Stores in the 6(f) Map was some sort of oversight. However, there is no exception that allows for the avoidance of the prerequisites of the LWCFA for altering a 6(f) Map.  *See* 36 C.F.R. § 59.3(b).  Indeed, NPS's own grants manual is explicit

that "**No changes may be made to the 6(f) boundary after final reimbursement unless the project is amended as a result of an NPS approved conversion.**" Walden Decl., Ex. T at 6-4 (emphasis added).  Quite simply, once the 6(f) Map is finalized, federal taxpayer dollars spent and the grant closed, the land is added to the public recreation estate and the statutory prerequisites must be followed, regardless of what *post hoc* rationales – such as the instant claim of "mistake" – are offered.

In this regard, *Friends of the Shawangunks, Inc. v. Clark*, 754 F.2d 446 (2d Cir. 1985), is particularly instructive.  There, an LWCFA grant was received for parkland that included a private easement preventing further constructing of various facilities on the parcel.  *Id.* at 448.  Several years after the grant, the grant recipient requested and NPS permitted an amendment to the easement so that a private developer could build a hotel and related facilities.  *Id.* at 449.  There, as here, NPS concluded that the conversion procedure was not required.  In a subsequent litigation the District Court agreed, concluding that the lands were "not intended for outdoor, public recreational use," and the amendment  "must be viewed as nothing less than a bonus to the public, and not as a diminution in, or conversion of, the availability of public, outdoor, recreation facilities."  *Id.*

The Second Circuit reversed, explaining that "in light of the policies of the Department of the Interior and the purposes of the statute, we interpret section 6(f)(3) 'public outdoor recreation uses' broadly, to encompass uses not involving the public's actual physical presence on the property."  *Id.* at 449.  Because the amendment "would convey away [the] right to prevent any change in the character of the land subject to the easement," "[i]t is plain that there is a conversion from public enjoyment of an unspoiled area to private [use]."  *Id.* at 451.  The court emphasized that the 16 U.S.C.  § 460l-8(f)(3) requirements "may seem simple, but they

nevertheless <u>must</u> be made." *Id.* (emphasis added).  Purported *post hoc* rationales like the supposed "bonus" to the public in *Shawangunks*, or the "mistake" here – must be settled by the LWCFA conversion process.  Such rationales, as the Second Circuit held, cannot justify ignoring the law.

**c.      NPS's *Ad Hoc* Final Decision Was Deliberately Erroneous**

Not only is the purported rationale for removing the Tobacco Warehouse and Empire Stores without the required conversion procedure irrelevant under the LWCFA, it is demonstrably false.  As described in pages 5-6, *supra*, there is simply no factual support for the notion that the 6(f) Map at issue was the result of some sort of oversight.  State Parks repeatedly certified to NPS that it had reviewed and determined that the Tobacco Warehouse and Empire Stores were properly included on the 6(f) Map, and had been informed of the consequences of conversion of use within the 6(f) Map.  In light of these facts, it was plainly erroneous for NPS to accept State Parks' assertion that the inclusion of the Tobacco Warehouse and Empire Stores within the 6(f) boundary was unintentional.

NPS's unquestioning adoption of State Parks' argument in the Final Decision is particularly inappropriate in that the Final Decision implicitly acknowledges that State Parks had misled NPS in 2008 by claiming that the Tobacco Warehouse was currently not suited for outdoor recreational use.  *See* Walden Decl., Ex. S at 3.  Furthermore, NPS was actually on notice that State Parks' 2011 submissions were premised on falsehoods and mischaracterizations, but deliberately closed the administrative record prematurely to prevent Plaintiffs from correcting these errors.  *See id.*, Ex. O.  NPS therefore made a decision that was knowingly premised on errors, and failed to articulate a coherent explanation for how the Tobacco Warehouse's inclusion on the 6(f) Map was unintentional.

Indeed, the Tobacco Warehouse was purposefully included on the 6(f) Map in 2001 and 2003 *because it is suitable for outdoor recreational activities*. And such activities are precisely what occurred there after the grant and until recently.[6] The Tobacco Warehouse has been the site of outdoor picnics, concerts, plays, shows, festivals, and dances. Each of these activities falls within the definition of "outdoor recreation activities" in the Manual. Moreover, as NPS was well aware from Plaintiffs' submissions, the Tobacco Warehouse was suitable for many other outdoor recreational uses, as many had been proposed over time.

Thus, even if the LWCFA did provide some sort of "mistake" exception to the conversion process (and it does not), it would be patently inappropriate to invoke it here. Instead of a conversion, this is a private land grab cloaked in a false *post hoc* rationale.

### 3.   National Historic Preservation Act

#### a.   Background

In 1966, Congress enacted the NHPA to preserve America's historic and cultural heritage. *See* 16 U.S.C. § 470(b)(1)-(7) (noting that "historic properties significant to the nation's heritage are being lost or substantially altered"). Under Section 106 of the NHPA, the head of a federal agency having jurisdiction over a federally assisted undertaking must "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." *Id.* § 470f. In addition, the agency official must afford the Advisory Council on Historic Preservation (the "Council"), an independent federal agency, a reasonable opportunity to comment on the undertaking. *Id.* The

---

6   While Empire Stores is not an outdoor recreational facility, it was properly included in the 6(f) Map, as the area receiving federal protection "normally exceeds that actually receiving LWCF assistance so as to assure the protection of a viable recreation entity." Walden Decl., Ex. T at 8-3.

NHPA authorizes the Council to promulgate regulations to implement Section 106. *Id.* § 470s. These regulations, which are found at 36 C.F.R. Part 800 and which detail the Section 106 process of review, "have the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979) (citations omitted).   The agency is to conduct the Section 106 review in coordination with "consulting parties," which may include the appropriate state historic preservation officer, local government representatives, parties with a demonstrated interest in the undertaking, and the public. 36 C.F.R. §§ 800.2-.3.

### b.   Section 106 Was Clearly Violated

NPS's failure to conduct a Section 106 review constitutes agency action "without observance of procedure required by law" under the APA. *See* 5 U.S.C. § 706(2)(D).  Under the APA, Plaintiffs need only show that NPS's approval of the conversion of the Tobacco Warehouse and Empire Stores ignored the procedures mandated by the NHPA. *See id.*  Section 106 requires NPS to take into account the effect of any undertaking that could affect a historic property, and to afford the Council an opportunity to comment on the undertaking. *See* 16 U.S.C. § 470f; *see also* 36 C.F.R. §§ 800.2-.7.  The available evidence reveals NPS's utter failure to recognize that Section 106 was even implicated.  It certainly was not followed.  Thus, NPS acted "without observance of procedure required by law," *see* 5 U.S.C. § 706(2)(D), and Plaintiffs are likely to succeed on the merits. *See WATCH v. Harris*, 603 F.2d 310, 327 (2d Cir. 1979) (on appeal of preliminary injunction pending NEPA review, reaching merits and directing that the injunction be made permanent "until defendants have complied with the requirements of NHPA and NEPA"); *accord Hall Cnty. Historical Soc'y v. Ga. Dep't of Transp.*, 447 F. Supp. 741, 751 (N.D. Ga. 1978) (granting preliminary injunction where the federal agency "in effect, simply 'rubber stamped' the state's determination").

First, according to NPS itself, an LWCF Section 6(f)(3) conversion of property to other than outdoor recreational use constitutes an undertaking that requires Section 106 review. *See* Walden Decl., Ex. T at 4-10 ("Under Section 106, LWCF proposals requiring NPS review and decision are undertakings."); *id.* at 4-12 ("Section 106 process must be applied to the Section 6(f)(3) protected area to be converted as well as the acquisition and development of the replacement parkland.").[7]

Second, the conversion's area of potential effects includes the Tobacco Warehouse and Empire Stores. Both are part of the Fulton Ferry District, which is listed on the National Register of Historic Places. Therefore, both are properly defined as "historic propert[ies]" under the NHPA. *See* 36 C.F.R. § 800.16(l)(1). Accordingly, NPS was required to invite consultation once it was apparent that the conversion might affect the Tobacco Warehouse and Empire Stores. *See id.* § 800.4(d)(2); *see also Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1153 (D. Mont. 2004) ("Because [the federal agency] failed to consult after identifying an historic site in the area of the [undertaking], it violated NHPA."); Walden Decl., Ex. T at 4-13 ("The NPS is ultimately responsible for determining whether a project proposal will affect a property in or eligible for listing in the National Register."). NPS, however, failed to consult with the SHPO, the Council, or the public about the undertaking.

Furthermore, NPS should have done so <u>before</u> considering the conversion request. *See* Walden Decl., Ex. T at 4-14 ("NPS shall not accept a LWCF proposal from the State for formal

---

[7] The LWCF Grant Manual is published by the NPS. "Generally speaking, an agency's own interpretation of an act that it is charged with executing is entitled to some weight, provided that the interpretation does not directly conflict with the intent of Congress." *WATCH v. Harris*, 603 F.2d 310, 324 (2d Cir. 1979) (citing *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 (1969) ("[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong[.]")).

review and decision until the Section 106 process has been completed."); *see also* 36 C.F.R. § 800.1(c) ("The agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered…").

NPS violated the NHPA by failing to follow the procedures mandated by Section 106 and 36 C.F.R. Part 800, because:  (1) an LWCFA Section 6(f)(3) conversion is an undertaking; (2) the Tobacco Warehouse and Empire Stores are "historic propert[ies]" under the NHPA; (3) NPS failed to determine whether the conversion would adversely affect the Tobacco Warehouse and Empire Stores (or affect them at all); and (4) NPS did not afford the Council a reasonable opportunity to comment on the undertaking.  Plaintiffs have therefore demonstrated a likelihood of success on the merits of their NHPA claim.

### 4.    National Environmental Policy Act

#### a.    Background

The National Environmental Policy Act ("NEPA") requires a federal agency to prepare an EIS prior to taking any major action significantly affecting the environment.  42 U.S.C. § 4332(C).   The purpose of an EIS is to "provide full and fair discussion of significant environmental impacts and to inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

#### b.    NEPA Was Clearly Violated

NEPA requires federal agencies, such as NPS, to include an EIS in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  As explained by the NPS Grant Manual:

> Federal actions are defined as projects, activities, or programs funded in whole or in part under the direct or indirect jurisdiction of a federal agency, including those carried out by or on behalf of a federal agency; <u>those carried out with federal financial assistance</u>; those requiring a federal permit, license, or approval; and those subject to state or local regulation administered pursuant to a delegation or approval by a federal agency.

Walden Decl., Ex. T at 4-2 (emphasis in original). "The LWCF is a federal assistance program and thus *all NPS LWCF decisions are subject to the provisions of NEPA....*" *Id.* (emphasis added).

Indeed, courts have found that the re-draw of a 6(f) Map resulting in the conversion of federally protected parkland constitutes a "major federal action" requiring NEPA compliance. *See, e.g., Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986) (finding that a project requiring "the approval of the Secretary of the Interior for conversion of park land to other than public outdoor recreation uses" constitutes "a federal action within the meaning of NEPA"). In violation of NEPA, NPS failed to prepare an EIS or an Environmental Assessment ("EA") in 2008 and again in 2011. Thus, just as with the LWCFA, NPS completely ignored the clear statutory prerequisites of NEPA.

**B.      Plaintiffs Are Being And Will Continue To Be Irreparably Harmed Unless The *Status Quo Ante* Is Immediately Restored**

An irreparable harm is one "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). There is a substantial chance that Plaintiffs, along with numerous other members of the community, cannot be returned to the position they previously occupied because the current plans for the Tobacco Warehouse will permanently alter this historically unique structure. Neither money damages, nor some other property, can take the place of the Tobacco Warehouse and Empire Stores. *See Patriot-BSP City Ctr. II v. U.S. Bank Nat'l Ass'n*, 715 F.

Supp. 2d 91, 95-96 (D.D.C. 2010) (finding money damages inadequate where property is "unique and historically significant").

Moreover, with every day the Tobacco Warehouse remains shuttered, opportunities for the public to enjoy it as a public outdoor recreational facility are lost forever. This loss constitutes irreparable harm. *See Galusha v. N.Y. State Dep't of Envtl. Conservation*, 27 F. Supp. 2d 117, 122 (N.D.N.Y. 1998) ("Plaintiffs argue essentially that every day they miss in the Park constitutes an irreparable harm because no amount of money could compensate for such a loss….Plaintiffs' access to [the Park] is impermissibly limited. Plaintiffs have established threat of irreparable harm. Absent preliminary relief, they will suffer an injury that is present, actual, and not calculable.").

A finding of irreparable harm also requires that the injury that a plaintiff will suffer must be "likely and imminent, not remote and speculative." *LIH ex rel. LH v. N.Y. City Bd. of Educ.*, 103 F. Supp. 2d 658, 664 (E.D.N.Y. 2000) (citation omitted). Since Plaintiffs, along with the rest of the public, are currently being denied access to the Tobacco Warehouse for outdoor recreational use, the harm here is beyond likely and imminent: it is actual and ongoing. *See Galusha*, 27 F. Supp. 2d at 122 (granting preliminary injunction and finding that regulations limiting motorized vehicle access to New York State park constituted "present, actual" irreparable harm). Further, additional harm is likely and imminent as plans proceed toward the permanent alteration of the Tobacco Warehouse. Indeed, a private theater company – which intends to roof the Tobacco Warehouse and close it except to paying customers – has already been designated as the Tobacco Warehouse's primary tenant. On March 2, 2011, the Brooklyn Daily Eagle reported that counsel for Defendant BBPDC announced that "Brooklyn Bridge Park is moving forward with development of the Tobacco Warehouse" as a private indoor facility.

*See* Walden Decl., Ex. U.   Indeed, there are plans in place to bore holes in the Tobacco Warehouse as soon as the current standstill expires on March 25, 2011.

Finally, "[i]rreparable harm is injury for which a monetary award cannot compensate." *Brown v. Giuliani*, 158 F.R.D. 251, 264 (E.D.N.Y. 1994).   A price tag cannot be put on the Tobacco Warehouse and Empire Stores, historic structures that have spanned three centuries. *See Patriot-BSP City Ctr. II*, 715 F. Supp. 2d at 96, 99 (granting motion for temporary restraining order).[8]

## CONCLUSION

For the reasons discussed herein, Plaintiffs respectfully request that this Court grant a Preliminary Injunction, directing NPS, pending this Court's review, to restore the Section 6(f) boundary map for grant 36-01225 for Empire Fulton Ferry State Park to its full boundaries as finalized in 2003, and including the Tobacco Warehouse and Empire Stores within the boundaries delineating federally protected outdoor recreational space; enjoining BBPDC from taking any action changing the use of the Tobacco Warehouse and Empire Stores to other than federally-protected outdoor recreational parkland; and granting such other and further relief as to the Court may seem just and proper.

---

[8] Plaintiffs do not believe that any bond is appropriate, as the requested relief is a temporary suspension of the NPS decision to approve the revisions to the 6(f) Map. There does not appear to be any argument that such suspension will result in any costs to NPS.

Dated: New York, New York
       March 8, 2011

GIBSON, DUNN & CRUTCHER LLP

By: _____
     Jim Walden, Esq. [JW-0447]
     James Hallowell [JLH-6074]

     200 Park Avenue
     New York, New York 10166-0193
     Telephone: (212) 351-4000
     Facsimile: (212) 351-4035
     *Pro bono Attorneys for Plaintiffs*