# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

BROOKLYN HEIGHTS ASSOCIATION, INC.,
JANE MCGROARTY, FULTON FERRY
LANDING ASSOCIATION, JOAN ZIMMERMAN,
and THE NEW YORK LANDMARKS
CONSERVANCY,

                         Plaintiffs,

        -against-

NATIONAL PARK SERVICE, KENNETH
SALAZAR, BROOKLYN BRIDGE PARK
DEVELOPMENT CORPORATION, BROOKLYN
BRIDGE PARK CORPORATION, and ST. ANN'S
WAREHOUSE, INC.,

                        Defendants.

------------------------------------------------------------- x

**MEMORANDUM & ORDER**

11-CV-226 (ENV) (VVP)

**VITALIANO, D.J.**

Plaintiffs Brooklyn Heights Association, Inc. ("BHA"), Jane McGroarty, Fulton Ferry

Landing Association, Joan Zimmerman, and the New York Landmarks Conservancy filed this

action against defendants National Park Service ("NPS"), United States Secretary of the Interior

Kenneth Salazar, and Brooklyn Bridge Park Development Corporation ("BBPDC") to bar any

injury arising from violations of federal regulatory law and state law.  Two additional parties,

Brooklyn Bridge Park Corporation ("BBPC") and St. Ann's Warehouse, Inc. ("St. Ann's"), have

been joined as defendants after the Court granted their motions to intervene.  Plaintiffs' claims,

now enumerated in their second amended complaint filed on March 21, 2011, arise under the

Land and Water Conservation Fund Act of 1965 ("LWCFA"), 16 U.S.C. § 460*l*-8, and its

implementing regulations promulgated at 36 C.F.R. Part 59; the National Environmental Policy

Act ("NEPA"), 42 U.S.C. § 4332, and its implementing regulations promulgated at 40 C.F.R.

Part 1502; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 550-559, 701-706; § 106 of

the National Historic Preservation Act of 1966 ("NHPA"), 16 U.S.C. §§ 470a to 470w-6; and

New York's public trust doctrine. Plaintiffs have moved for preliminary injunctive relief

pursuant to Fed. R. Civ. P. 65. Following a hearing on March 21, 2011, and for the reasons

stated below, the motion is granted.

## I.   BACKGROUND

### A.   LWCFA and Related Regulations

At the very heart of this case is a Land and Water Conservation Fund ("LWCF") grant

NPS awarded to the New York State Office of Parks, Recreation, and Historic Preservation

("OPRHP"). Through such grants, the federal government provides assistance to States for the

acquisition and development of public outdoor recreation resources. A core compliance

provision of LWCFA is set forth in section 6(f)(3), which reads in relevant part:

> No property acquired or developed with assistance under this section shall,
> without the approval of the Secretary [of the Interior], be converted to other than
> public outdoor recreation uses. The Secretary shall approve such conversion only
> if he finds it to be in accord with the then existing comprehensive statewide
> outdoor recreation plan and only upon such conditions as he deems necessary to
> assure the substitution of other recreation properties of at least equal fair market
> value and of reasonably equivalent usefulness and location.

16 U.S.C. § 460l-8(f)(3).[1]  Section 6(f)(3), in short, ensures that once a property is assisted by an

LWCF grant, it shall be preserved in perpetuity for public outdoor recreational use — or replaced

by a substitute property of equal value, usefulness, and location.

---

[1]   For the sake of clarity: the name "section 6(f)(3)" refers to the section of the original
LWCFA passed by Congress, notwithstanding the current statutory citation. The relevant
documents in the administrative record, including regulations and agency guidelines, refer to
this section as "6(f)" and "6(f)(3)" interchangeably, and the Court will do likewise.

The LWCF post-grant processes are governed in greater detail by Title 36 of the Code of Federal Regulations, Part 59. For purposes of the instant case, the most relevant regulations are contained in section 59.1, laying out the "Applicability" of the regulations to parcels assisted by LWCF grants:

> These post-completion responsibilities apply to each area or facility for which Land and Water Conservation Fund (L&WCF) assistance is obtained, regardless of the extent of participation of the program in the assisted area or facility and consistent with the contractual agreement between NPS and the State. Responsibility for compliance and enforcement of these provisions rests with the State for both State and locally sponsored projects. The responsibilities cited herein are applicable to the area depicted or otherwise described on the 6(f)(3) boundary map and/or as described in other project documentation approved by the Department of the Interior. In many instances, this mutually agreed to area exceeds that actually receiving L&WCF assistance so as to assure the protection of a viable recreation entity.

36 C.F.R. § 59.1. Once infused with a LWCF grant, the benefited property is then governed by section 59.3, which begins by emphasizes the centrality of LWCFA § 6(f)(3).

> Section 6(f)(3) of the L&WCF Act is the cornerstone of Federal compliance efforts to ensure that the Federal investments in L&WCF assistance are being maintained in public outdoor recreation use. This section of the Act assures that once an area has been funded with L&WCF assistance, it is continually maintained in public recreation use unless NPS approves substitution property of reasonably equivalent usefulness and location and of at least equal fair market value.

Id. § 59.3(a). Section 59.3(c), more critically, details the procedural steps of conversion if a State wishes to designate a property for something other than public outdoor recreation, notwithstanding the LWCF investment. In such a contingency, the State must evaluate "[a]ll practical alternatives to the proposed conversion," determine the fair market values of the property to be converted and the replacement property, and satisfy the criteria for replacement properties. Id. § 59.3(b)(1). Finally, § 59.3(d) reiterates that, even with regard to proposed changes from one LWCF-eligible use to another, "[c]hanges to other than public outdoor

3

recreation use require NPS approval and the substitution of replacement land in accordance with section 6(f)(3) of the [LWCFA] and paragraphs (a) through (c) of this section." Id. § 59.3(d).

Further guidance is provided by the LWCF State Assistance Program Federal Financial Assistance Manual, most recently issued by NPS on October 1, 2008 (the "Manual"),[2] which includes a section on the "Application Process" a State must follow in order to receive LWCF assistance. One of the required application documents is a hand-signed and dated copy of the "Section 6(f) boundary map," which must "clearly delineate the area to be included under the conversion provisions of Section 6(f)(3) of the LWCF Act." Manual 6-3. The Manual also provides that "NPS will contact the State about any needed changes to the map," and that "[p]rior to the date of final reimbursement for development . . . projects, the State and NPS may mutually agree to alter the Section 6(f) boundary to provide for the most satisfactory unit intended to be administered under the provisions of Section 6(f)(3)." Id. at 6-4. The Manual then provides, in a separate paragraph: "No changes may be made to the 6(f) boundary after final reimbursement unless the project is amended as a result of an NPS approved conversion." Id.

As for what area must be covered in a § 6(f) boundary map, the Manual provides:

> At a minimum, the Section 6(f) boundary must encompass a viable public outdoor recreation area that is capable of being self-sustaining without reliance upon adjoining or additional areas not identified in the scope of the project. Except in unusual cases where it can be shown a lesser unit is clearly a self-sustaining outdoor recreation resource, the area subject to Section 6(f) protection will be the park, open space, or recreation area being developed or expanded.

---

[2] This is the version of the Manual contained in the administrative record filed by NPS in this case. The Manual itself states that "[t]he Manual in effect at the time a grant is awarded governs the project except for post-completion requirements." As a result, the 2008 Manual governs the relevant post-completion requirements at issue in this case, whereas the Manual in effect when the grant was approved in 2001 governs the propriety of the original grant and mapping process. The earlier manual, however, is not part of the administrative record filed by NPS. For present purposes, the Court will look to the 2008 Manual, though, in any event, the Manual is not dispositive.

Id. at 6-4. The application must also include, inter alia, a proposal description, a pre-award on-site inspection report, and the "Project Agreement and General Provisions." The Project Agreement "[b]inds the Federal Government and the State to certain obligations through its acceptance of federal assistance, including the rules and regulations applicable to the conduct of a project under the Act and any special terms and conditions to the project established by the NPS and agreed to by the State." Id. at 6-3.

## B.    Empire Fulton Ferry State Park and the LWCF Grant

Empire Fulton Ferry State Park ("EFFSP") was established in 1978 by OPRHP, and the park was completed in 1987. This park space lies along the East River waterfront between the Brooklyn and Manhattan Bridges, near the site of the old Fulton Ferry Landing in Brooklyn. As its name implies, EFFSP was created as a state park to be operated by a state agency, OPRHP. As of the 2001 LWCF mapping, if not earlier, EFFSP included the structures in the crosshairs of this case, the Tobacco Warehouse and Empire Stores, both built in the 1860s. At the time of the grant application, the Tobacco Warehouse was by all accounts in poor physical condition, with a partially collapsed roof, and officially closed to the public. Notwithstanding, the Tobacco Warehouse has been on the National Register of Historic Places since 1974. Empire Stores is a brick structure four to five stories in height, in various portions, with a rectangular footprint and a single façade and seven separate buildings inside. The structure once housed coffee warehouses and contains over 300,000 square feet of space. The Tobacco Warehouse, directly adjacent to the west, has brick walls two stories in height, with a trapezoidal footprint divided by a single interior wall into two spaces, one rectangular (18,200 sq. ft.) and one triangular (approximately 7,600 sq. ft.).

In 2001, it was OPRHP that successfully applied for LWCF assistance to benefit EFFSP, under project number 36-01225. That project was officially approved pursuant to a project agreement dated November 30, 2001. The agreement's General Provisions included the following covenant:

> The State agrees that the property described in the project agreement and the signed and dated project boundary map made part of that agreement is being acquired or developed with Land and Water Conservation Fund assistance, or is integral to such acquisition or development, and that, without the approval of the Secretary, it shall not be converted to other than public outdoor recreation use but shall be maintained in public outdoor recreation in perpetuity . . . Prior to the completion of this project, the State and the Director may mutually alter the area described in the project agreement and the signed and dated project boundary map to provide the most satisfactory public outdoor recreation unit . . .

(R. 139.) The stated purpose of the project was to make improvements to the "Cove Area" along the waterfront, stabilizing the shoreline, preventing erosion, and constructing a new path along the river. The Project Description, dated June 20, 2001, elaborated that "[t]he Cove is approximately 400 feet in length along the shoreline and lies directly in front of the historic Empire Stores Building (7 buildings with party walls and a unified façade). . . . The Empire Stores/ Tobacco Warehouse complex was the subject of an historic structures report in 1990, prepared by Beyer, Blinder Belle et al. Archaeological test pits were also undertaken and retrieved artifacts were catalogued and sent to OPRHP's Peebles Island facility for storage." (R. 147.) The Preapproval On-Site Inspection Report, dated May 2, 2001, performed and signed by OPRHP Park Engineer John Bagley, and reviewed and signed by OPRHP Capital Facilities Regional Manager Michael Tesik, included a checklist of findings, answering "Yes" to questions including: "Are there any known historic/archeological sites?"; "Has the sponsor (State or local) been told (verbally or in writing) what a 6(f)(3) boundary is and the implications of conversion in

use?"; and "Has mutual agreement with State/local sponsor been established on designation of exact 6(f)(3) boundary?" (R. 148-50.)

The § 6(f)(3) boundary map included in the EFFSP file is entitled "Empire Fulton Ferry State Park 6-F Map." Bearing the project number 36-01225, the map details an area bounded on the north by the East River, on the west by New Dock Street, on the south by Water Street, and on the east by Main Street. Handwritten labels with arrows point to the what is described both as "Boundary of 6F Area" and "Park Boundary." At the bottom of the map, handwriting and a signature indicate that it was submitted by OPRHP Senior Administrative Analyst Marie Devery on October 17, 2001. (R. 160.)

The OPRHP application also included a series of five photographs of EFFSP, each with a caption, before any LWCF-assisted improvements were made. (R. 706-08.)[3] The first photo includes as part of its caption "View so. east over cover to Main Street – Empire Stores right rear," while the third photo includes "Empire Stores At Rear." The photos were accompanied by a "Key to Site Photos," a map of EFFSP showing where each photo was taken. (R. 705.) The map includes handwritten underlined text, "Empire - Fulton Ferry State Park," written in the middle of the park site, with arrows extending in four directions indicating the park's reach, including an arrow pointing to the building labeled "Tobacco Warehouse" and an arrow pointing to the building labeled "Empire Stores."

---

[3] These photos and the accompanying "Key" are not included in the OPHRP application portion of the administrative record prepared for the Court, but only in the section reproducing the materials submitted by the New York City Department of Parks and Recreation and considered by NPS in making its February 2011 decision. The Court assumes that this latter section, which is more comprehensive, accurately represents what OPRHP actually submitted to NPS in 2001. In any event, the logistical issue does not affect the outcome here.

Once the improvements to EFFSP were complete, OPRHP transmitted the closeout documentation for the LWCF grant to NPS, by letter dated July 16, 2003, authorized by OPRHP Alternate State Liaison Officer Kevin Burns. The documentation was directed to NPS Outdoor Recreation Planner Jean Sokolowski (R. 162), and included, inter alia, a Final On-Site Inspection Report, Amendment to Project Agreement, and additional photographs showing the improvements made.

The Final On-Site Inspection Report, dated April 18, 2003, was generated and then signed by Tesik, and reviewed and signed by Devery. The header of the report bears the legend "(For non-acquisition projects – required 90 days after completion and/or expiration of a project, but *before* final reimbursement)" (emphasis original). This report included another checklist of findings, answering "No" to the question of "[h]ave there been any changes in facilities and/or site location?" It answered "Yes" to two questions regarding the § 6(f)(3) boundary: "Has the 6(f)(3) boundary established in the pre-approval stage been reaffirmed with the project sponsor?" and "Has the sponsor (State agencies or locals) been told (verbally and in writing) what a 6(f)(3) boundary is and the implication of conversion of use?" (R. 156-57.) The Amendment to Project Agreement deleted "Landscaping & Utilities" from the scope of the project due to a lack of State funding. (R. 158-59.) This amendment was later signed by NPS Outdoor Recreation Planner Jean Sokolowski, on September 23, 2003. (R. 173.) The photographs showed the completed improvements (R. 167-70); in one, a wide-angle shot clearly shows Empire Stores and the Tobacco Warehouse, with the caption, "Empire Fulton Ferry State Park Cove Restoration" and "Looking Southeast at site." (R. 168.)[4]

---

[4] Later maps of EFFSP delineate additional land along the waterfront to the northeast of this parcel, running east of Main Street and north of Plymouth Street. The record contains no

By letter dated September 26, 2003, from Sokolowski to Burns, NPS acknowledged receipt of the closeout documentation for the LWCF grant, in the final amount of $274,525. The letter noted that "[r]eview of the closeout material has found the project to be in compliance with LWCF program requirements." (R. 172.) No other documentation regarding the application for or closeout of the LWCF grant is contained in the administrative record.

### C.    OPRHP Development and Public Use of the Structures

By 2002 but perhaps earlier, OPRHP had stabilized the walls of the Tobacco Warehouse, removed the remainder of its roof, and opened it for at least some public uses. OPRHP began allowing third-party groups to hold special events or public programming at the Tobacco Warehouse, and it is undisputed that "[w]hen the Warehouse was not programmed for a special event or use, it was often open to the public to enter and walk through." (R. 202.) Around the same time — although exactly when is not immediately apparent from the record — OPRHP began using Empire Stores to house its administrative offices for EFFSP as well as the public restrooms for the park.

### D.    December 2008 NPS Action

On November 5, 2008, the OPRHP Chief of Grants, Melinda Scott, wrote Sokolowski to request that NPS "revise the 6(f) boundary map" for EFFSP. Scott began by acknowledging that "[h]istorically, when funding has been provided in a park, the entire park is mapped pursuant to section 6(f). This practice has created difficulties, especially when portions of the land include buildings that do not have an outdoor recreational component. For this reason, we wish to revise the 6(f) boundary map" for EFFSP. In particular, Scott continued,

---

information as to whether this additional land was part of EFFSP during the time the LWCF grant was open from November 30, 2001 to September 26, 2003.

although a 6(f) map was filed for this grant, its boundaries included four existing former warehouse buildings on the southern side of the park. At the present time, [OPRHP] can state that these former warehouse buildings are not suitable for nor used by the public for outdoor recreational opportunities in the park. [OPRHP] therefore believe[s] that revising the 6(f) map will not adversely impact the utility and viability of the remaining parkland.

We are submitting a revised 6(f) boundary map for [EFFSP] and request your concurrence with this revision.

As current situations cause us to review 6(f) maps and opportunities arise to revise correct or update these important documents [sic], we look forward to working with your office . . .

(R. 174.) The letter also transmits the "revised" 6(f)(3) boundary map for EFFSP, excluding the Tobacco Warehouse and Empire Stores from the LWCF-protected boundary.

On December 12, 2008, NPS responded to OPRHP in a letter to Scott from Jack Howard, Manager of Recreation, Conservation, and Grants Assistance in the NPS northeast regional office in Philadelphia, which has responsibility for New York. Howard refers to the EFFSP grant as an "Administratively and Financially closed" LWCF project and states that "6(f) maps are 'final', with no changes occurring unless there is a conversion or significant error. He notes, however, that "[a]ccording to the project file, it appears that when the project was approved, and later Closed, both NPS and OPRHP inadvertently overlooked the existence of four warehouse buildings located within the project boundary." He then concluded that

[s]ince the LWCF Program does not provide assistance for existing or proposed indoor recreational facilities and these former warehouses are not suitable for recreational use by the public, the pre-existing warehouses should have been excluded. Therefore, although LWCF regulations do not normally allow for the re-alignment of the 6(f) boundary after a project has been Administratively and Financially Closed, [NPS] recognize[s] the oversight in this case and concur[s] with [OPRHP's] request to revise the boundary. The new map [OPRHP] included in [its] correspondence will be recognized as the legal 6(f) boundary map for this project.

(R. 176.) Aside from the Scott and Howard letters, the administrative record contains no documentation or memorialization regarding the agency action.

## E. Transfer of the Structures from OPRHP to BBPC

Throughout the last decade, the City and State have engaged in various planning efforts for a larger Brooklyn Bridge Park ("BBP"), covering over 85 acres of the Brooklyn waterfront, including piers and appurtenant upland extending from the Manhattan Bridge to Brooklyn Heights. The plans for BBP all proposed the incorporation of EFFSP into BBP. On July 8, 2010, OPRHP conveyed title in EFFSP to defendant BBPDC, a subsidiary of the New York state-owned Empire State Development Corporation ("ESDC"), that had been created to develop BBP.[5] The deed transfer split EFFSP into two parcels, one parcel containing the Tobacco Warehouse and Empire Stores with § 6(f)(3) protection provided, and the other parcel containing the rest of the park, described as "Open Space," with § 6(f)(3) protection explicitly provided. The transfer agreement bootstraps the revised § 6(f)(3) boundary map approved in the December 2008 NPS decision by attachment. (R. 246-320.) Both parcels were then conveyed in a 99-year ground lease to defendant BBPC, a public corporation controlled by the City of New York, tasked with operating BBP. Today, BBP does not include the land occupied by Tobacco Warehouse or Empire Stores. The public website for BBP currently includes a section on what is now referred to as Empire Fulton Ferry Park thusly:

> Empire Fulton Ferry Park is the existing nine-acre waterfront park located between the historic Manhattan and Brooklyn Bridges. From its graceful lawns and boardwalk, Empire Fulton Ferry offers beautiful views of the harbor and Lower Manhattan skyline. Bordering the park are the Civil-War era Empire

---

[5] Since the issue is not presented, nor the record on this point developed, the Court expresses no view as to whether the transfer of parkland by OPRHP to a development corporation was in compliance with New York state law and any applicable rules or regulations.

Stores and Tobacco Warehouse, which played an integral part in the great shipping activities that once dominated this portion of the Brooklyn waterfront.[6]

This public agency website also notes that "[t]he park is currently closed and under construction." An "interactive map" of BBP, located on the website, clearly shows both the Tobacco Warehouse and Empire Stores, labeling them both as "Points of Interest." Clicking on the "Point of Interest" icons brings up windows with further information about the two structures, describing the Tobacco Warehouse as an "iconic Civil War-era structure . . . [u]sed for an array of both public and private events."[7]

The Tobacco Warehouse and Empire Stores are also closed to the public at this time. Plaintiffs suggest that this closure may be related to defendants' plans for adaptive reuse of the structures, while defendants contend that the structures' closure has nothing to do with those plans and is for the purpose of preventing public entry into the Empire Fulton Ferry Park portion of BBP while construction continues. Resolution of this factual squabble is not required for present purposes.

## F.  St. Ann's Warehouse Proposal

On August 24, 2010, BBPC issued a request for proposal ("RFP") for adaptive reuse of the Tobacco Warehouse. Defendant St. Ann's, which operates a performance space at 38 Water Street, across the road from Empire Stores, submitted the only response, proposing to convert the Tobacco Warehouse into their new performance space; the proposed project would preserve the

---

[6]  Empire Fulton Ferry, Brooklyn Bridge Park, http://www.brooklynbridgeparknyc.org/the-park/empire-fulton-ferry (last visited April 7, 2011). Although a court reviewing an agency action is generally limited to the administrative record, the Court may take judicial notice of the BBP website, which is a government publication. See, e.g., Nebraska v. Envtl. Protection Agency, 331 F.3d 995, 999 n.3 (D.C. Cir. 2003); Zappier v. Sun Life Assur. Co. of Canada, No. 05-CV-5300, 2006 WL 2621110, at *8 (S.D.N.Y. Aug. 10, 2006).

[7]  Interactive Map, Brooklyn Bridge Park, http://www.brooklynbridgeparknyc.org/interactive-map/?location=efferryy (last visited April 7, 2011).

historic walls of the Warehouse, with a roofed theater in the rectangular portion of the structure, and an outdoor garden and gathering space in the triangular portion. On November 17, 2010, BBPC officially announced that St. Ann's was the winner of the RFP process. BBPC and St. Ann's subsequently entered into a provisional sublease of the Tobacco Warehouse, with conditions and required goals on a timetable for the planning, fundraising, and construction of the project. One of the steps in that planning process is to analyze the soil underneath the concrete floor of the structure to determine if construction may proceed; this will require drilling multiple holes into the concrete floor and boring into the soil, after which, defendants claim, the holes will be refilled and the concrete replaced. Plaintiffs have responded that the project, including moving heavy equipment into the narrow entrances of the Tobacco Warehouse and operating it inside, presents the strong possibility of damage to the historic structure.

### G. Litigation and the February 2011 NPS Action

In a letter dated July 15, 2010, plaintiff McGroarty, on behalf of plaintiff BHA, requested that the NPS reverse its 2008 determination. After numerous communications among NPS, BHA, OPRHP, and the City, which sought to participate in the process given its interest in BBPC, plaintiffs filed the instant action on January 13, 2011, seeking a temporary restraining order and/or preliminary injunction. The Court denied the temporary restraining order but signed an Order to Show Cause setting a hearing date on plaintiffs' motion for preliminary injunction. The parties then agreed to postpone the hearing, pending settlement talks. On January 26, 2011, plaintiffs withdrew their motion for preliminary relief, stating that "the parties ha[d] reached an agreement regarding the interim status of the Tobacco Warehouse whereby, as part of the agreement, counsel for the National Park Service has advised the City of New York to treat the

Tobacco Warehouse as if it may be restored to the [section] 6(f) map." Subsequently, the City and BHA submitted additional materials to NPS for its consideration.

On February 14, 2011, following an apparent obstacle in settlement negotiations, NPS issued its final decision in a letter from Wayne Strum, Acting Chief, State and Local Programs Division at the NPS headquarters in Washington, D.C., addressed to both McGroarty and Andy Beers, the Acting Commissioner of OPRHP. Strum referred to the 2008 action as a "decision to approve a technical correction to the Section 6(f) boundary" for EFFSP, and noted that "NPS has treated [BHA's] request as an informal appeal of the December 2008 decision." In addition, Strum recapped the materials NPS had considered in this "informal appeal," including communications and materials from OPRHP, the office of Congresswoman Nydia Velázquez, BHA, and BBPC, as well as a "follow-up conference call with the city and State officials" on February 7, 2011 "to ensure that NPS had a complete record of matters relating to this project grant."

Providing background for the decision, Strum acknowledged the rule established in § 6(f)(3) and the conversion procedure mandated by 36 C.F.R. § 59.3 but proclaimed that his "office understands that over time, regional staff have approved limited, technical corrections to the 6(f) boundary where they determined there was, in fact a significant mistake in how the boundary was mapped [sic]." The letter does not elaborate as to the timing and circumstances of such "limited, technical corrections," nor does it provide any examples of them, nor does it identify by what authority these agency functionaries made such changes to other 6(f) maps. Strum also noted that "[t]ypical reasons for excluding a portion of a public park or recreation area from 6(f) protection include . . . private or commercial development, [or] pre-existing buildings or structures, with plans for uses not allowable in Section 6(f) areas." More to the

point here, though, if any authority does exist to support Strum's claim, none is apparent from the relevant regulations or the Manual.

Turning to the decision itself, Strum observed that "it is clear that at the time of NPS approval of the State's application for Federal assistance (November 30, 2001), the Tobacco Warehouse was not suitable for public outdoor recreation use," and "no plans were included in the LWCF application regarding the future disposition of the structures or their intended public outdoor recreation use." Strum then summarizes the various plans and proposals for the Tobacco Warehouse, concluding that "[t]he range of various uses proposed for the site, some eligible, some ineligible, should have resulted in the exclusion of the TW from the project boundary." Instead, OPRHP staff "proposed a 6(f) map that included the TW and the Empire Stores," as they "were apparently not aware that the plan for and ultimate uses of the TW and Empire Stores were ongoing at the highest levels of State and city government" and their proposed 6(f) boundary map was "not coordinated with State and city officials involved in making decisions for the future of EFFSP," notwithstanding "OPRHP twice confirming, both in application and close-out documentation checklists that it understood the implications of the proposed 6(f) boundary." In the end, Strum declared that he "concur[red] with the result of the Northeast Region's 2008 determination that the inclusion of the Empire Stores and the Tobacco Warehouse within Section 6(f) boundary [sic] was a correctable mistake," because "the State never intended prior to the grant completion to commit to use the Tobacco Warehouse solely for public outdoor recreation." Finally, Strum noted that "[t]his decision supersedes the decision contained in the NPS December 12, 2008, letter and represents the final administrative determination of the Department of the Interior in this regard."

## II.   DISCUSSION

### A.    Standard for Preliminary Injunction

Whether to grant or deny a preliminary injunction lies within the sound discretion of the district court. S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 237 (2d Cir. 2001); P & G v. Ultreo, Inc., 574 F. Supp. 2d 339, 344 (S.D.N.Y. 2008). It is well-settled that a "party seeking a preliminary injunction must demonstrate '(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 192 (2d Cir. 2004) (quoting Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 96 (2d Cir. 2002)).

In addition, where the moving party requests a "mandatory" preliminary injunction — that is, one that alters the status quo by commanding some positive act, as opposed to just maintaining the status quo — or if the injunction will provide the moving party with "substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the moving party "must satisfy a higher standard, by showing a clear or substantial likelihood of success." Bose Corp. v. Silonsonnic Corp., 413 F. Supp. 2d 339, 341 (S.D.N.Y. 2006) (quoting Tom Doherty Assocs. v. Saban Entm't, 60 F.3d 27, 33-34 (2d Cir. 1995)). Here, the result is the same regardless of the standard applied.

### B.    Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002). Irreparable harm requires a plaintiff to show "(1) 'he is likely to suffer irreparable injury

in the absence of an injunction'; (2) 'remedies at law, such as monetary damages, are inadequate to compensate for that injury'; (3) the balance of hardships tips in his favor; and (4) 'the public interest would not be disserved by the issuance of a preliminary injunction." Rex Med. L.P. v. Angiotech Pharms. (US), Inc., No. 10-CV-8746, 2010 WL 4977775, at *3 (S.D.N.Y. Dec. 1, 2010) (quoting Salinger v. Colting, 607 F.3d 68, 74-75 (2d Cir. 2010)).[8] The alleged injury must be "actual and imminent, not remote or speculative." Kamerling, 295 F.3d at 214. As for the adequacy of potential remedies, it is well-settled that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute. See, e.g., TR Petroleum, LLC v. Sunoco, Inc., No. 07-CV-475, 2008 WL 897702, at *2 (E.D.N.Y. Mar. 31, 2008)

Given this framework, plaintiffs have made a clear showing of irreparable harm meriting preliminary injunctive relief. It is undisputed that, absent an order of this Court to the contrary, BBPC and/or St. Ann's will commence the drilling and boring of pits into the concrete floor of the Tobacco Warehouse at their earliest opportunity.[9] The prospective injury is surely imminent. Though, as to the likelihood of whether the Tobacco Warehouse will suffer irreparable damage itself, no party can do much more than speculate: defendants claim that the pits, which are to be drilled in order to test the soil beneath the structure as a preliminary step in the construction of

---

[8] Although the Second Circuit's Salinger decision specifically dealt with copyright infringement and adopted the standard announced by the Supreme Court in eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837 (2006), which concerned injunctive relief in the patent infringement context, Salinger noted that there was "no reason that eBay would not apply with equal force to an injunction in *any* type of case." Salinger, 607 F.3d at 78 n.7. As a result, the Court will use the standard for irreparable harm articulated in eBay and Salinger.

[9] Such work has been delayed by a standstill agreement among the parties.

the proposed theater, may be easily filled and the floor restored; plaintiffs respond that the very act of bringing heavy drilling and boring equipment through one of the relatively small entrances to the building, then operating that drilling equipment inside it, creates a real risk of damage to a national historic landmark. What is clear and compelling, though, is that all agree that the Tobacco Warehouse is worthy of preservation and care, and thus the inadequacy of monetary compensation for any harm to it is self-evident.[10]

As for the balance of hardships, St. Ann's claims that it will be harmed by any preliminary injunction that might impede its ability to meet its milestones vis-à-vis its agreement with its co-defendant BBPC, and by extension, BBPDC. Such a concern is, in the final analysis, primarily one of defendants' own making, as the timetable can simply be amended to incorporate whatever changes this litigation might effect. It is also, therefore, fully resolvable in the same manner as its making — without judicial determination. Lastly, as to the public interest, far from being a disservice, issuance of preliminary injunctive relief is clearly in the public interest. While the presumptive order would suspend the effect of the putative changes to the 6(f)(3) boundary map made by NPS, it would also preserve the status quo on the ground, ensuring the

---

[10] This is further supported by the grant agreement itself, which provides:

> The State agrees that the benefit to be derived by the United States from the full compliance by the State with the terms of this agreement is the preservation, protection, and the net increase in the quality of public outdoor recreation facilities and resources which are available to the people of the State and of the United States, and such benefit exceeds *to an immeasurable and unascertainable extent* the amount of money furnished by the United States by way of assistance under the terms of this agreement. The State agrees that payment by the State to the United States of an amount equal to the amount of assistance extended under this agreement by the United States would be *inadequate compensation* to the United States for any breach by the State of this agreement. The State further agrees, therefore, that the appropriate remedy in the event of a breach by the State of this agreement shall be the specific performance of this agreement.

(R. 140 (emphasis added).)

physical integrity of the structures. There is also an obvious public interest in confining government agencies to actions that are within the limitations of the authority delegated to them by the people's elected representatives.

## C.  Likelihood of Success on the Merits

### 1.  Standard of Review of a Final Agency Action

Given the plaintiffs' showing of irreparable harm, the inquiry now turns to their likelihood of success on the merits. Under APA review of a final agency action pursuant to 5 U.S.C. §§ 702 and 704, a reviewing court "shall decide all relevant questions of law, interpret . . . statutory provisions, and determine the meaning or applicability of the terms of an agency action" and shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706. Pursuant to this deferential standard, the agency action shall not be set aside unless the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658, 127 S. Ct. 2518, 2529 (2007) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983)). The "reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found

and the choice made." Forest Watch v. U.S. Forest Service, 410 F.3d 115, 118-19 (2d Cir. 2005) (quoting Henley v. FDA, 77 F.3d 616, 620 (2d Cir. 1996)).

Deference is also owed to an agency's construction of the statutes governing it, under the Chevron doctrine. This analysis involves two steps. Initially, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," but, however, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82 (1984); see also, e.g., New York Currency Research Corp. v. Commodity Futures Trading Comm'n, 180 F.3d 83, 88 (2d Cir. 1999).

As for the regulations promulgated by an agency, it is axiomatic that "an administrative agency must adhere to its own regulations." Singh v. U.S. Dep't of Justice, 461 F.3d 290, 296 (2d Cir. 2006). Fidelity to the regulations is required "even if [they] were not statutorily or constitutionally mandated," but "an agency's interpretation of its own regulations is entitled to substantial deference 'unless it is plainly erroneous or inconsistent with the regulation.'" Bergamo v. Commodity Futures Trading Comm'n, 192 F.3d 78, 79-80 (2d Cir. 1999) (internal citation omitted) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S. Ct. 1215, 1217 (1945)).

Finally, a reviewing court must generally confine itself to the administrative record, as "after-the-fact rationalization for agency action is disfavored." Yale-New Haven Hosp. v. Leavitt, 470 F.3d 71, 81 (2d Cir. 2006). A court "may not 'properly affirm an administrative action on grounds different from those considered by the agency.'" Forest Watch, 410 F.3d at

119 (quoting <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999)); <u>see also</u> <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 87, 63 S. Ct. 454, 459 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); <u>Envtl. Def. Fund, Inc. v. Costle</u>, 657 F.2d 275, 284 (D.C. Cir. 1981) ("It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made . . . not some new record completed initially in the reviewing court.").

      2.    <u>Review of the NPS Action</u>

Based on an examination of the record and the relevant law, there is a clear and substantial likelihood that plaintiffs will be able to prevail on their LWCFA and APA claims.[11] As a threshold matter, there is no dispute that, as to the December 2008 and February 2011 decisions, NPS did not follow the conversion process laid out in section 6(f)(3) of the LWCFA. With the high ground unattainable, NPS essentially retreats to a demurrer, opposing plaintiffs' demand for preliminary injunction on two principal grounds: first, that the revision of the 6(f)(3) boundary map was the correction of a mistake, as OPRHP never intended to include the Tobacco Warehouse and Empire Stores on the map when it applied for and subsequently closed out the LWCF grant, and, second, that NPS has the inherent authority to make such revisions to a §

---

[11] The Court does not reach the plaintiffs' other claims at this juncture, as the LWCFA and APA claims are sufficient for the entry of a preliminary injunction. Moreover, the parties appear to agree that plaintiffs' NEPA and NHPA claims hinge on their LWCFA claims; if a violation is found as to the latter, violations as to the former follow accordingly. As to the claim against BBPDC for a violation of the New York public trust doctrine, that is a separate issue beyond the scope of the present inquiry.

6(f)(3) boundary map without triggering the conversion process otherwise required by that section.[12]

The house of cards erected by the defense cannot withstand the gentlest breeze. First to fall is the plaint of OPRHP's mistake in its original boundary designation. That is factually belied by the actual administrative record of the LWCF grant. The § 6(f)(3) boundary map submitted by OPHRP and accepted by NPS contains not the slightest hint of mistake. There is no suggestion of a cartographical error or any kind of inadvertent ministerial or clerical oversight. The purposeful inclusion and acceptance of the structures within the 6(f)(3) boundary is further confirmed by a wealth of details from the record. To start, the Project Description included in the grant application specifically includes "[t]he Empire Stores/ Tobacco Warehouse complex," describing it as "the subject of an historic structures report in 1990, prepared by Beyer, Blinder Belle et al. Archaeological test pits were also undertaken and retrieved artifacts were catalogued and sent to OPRHP's Peebles Island facility for storage."[13] There is also a further description of "the historic Empire Stores Building (7 buildings with party walls and a unified façade)." This description of the LWCF-assisted site including the Tobacco Warehouse and Empire Stores is bolstered by the "Key to Site Photos" map, which even more clearly indicates the intentional inclusion of the structures, with arrows pointing to each structure.

_____

[12] Even if NPS possessed such authority, which, at least in this context, it does not, as will be discussed infra, it is clear the finding of a "correctable mistake" was flawed both substantively and procedurally.

[13] Defendants now argue that this indicates that the Tobacco Warehouse was being used for "[a]rchaeological" purposes, which are not eligible for LWCF funding. This argument is not supported anywhere else in the record, and there is nothing to suggest that the "test pits" somehow dictated archaeological use of the structures going forward. On the contrary, the inclusion of this otherwise unnecessary detail provides further support for the conclusion that OPRHP certainly intended the Tobacco Warehouse and Empire Stores to be included in the project and be within the § 6(f)(3) boundary.

Every indication, in other words, suggests that OPRHP, on behalf of New York State, intentionally included the entirety of EFFSP, as it then stood, on the map, as indeed the NPS Manual strongly advises is the normal practice. Manual at 6-4 ("Except in unusual cases where it can be shown a lesser unit is clearly a self-sustaining outdoor recreation resource, the area subject to Section 6(f) protection will be the park, open space, or recreation area being developed or expanded.") Evidence of OPRHP's intentional inclusion of the structures can also be gleaned from the inspection reports submitted to NPS in the initial application in 2001 and later in the closeout documentation in 2003. In the 2001 pre-approval checklist, OPRHP affirmed that "the sponsor (State or local) [had] been told (verbally or in writing) what a 6(f)(3) boundary is and the implications of conversion in use" and that "mutual agreement with State/local sponsor [had] been established on designation of exact 6(f)(3) boundary." In the 2003 closeout checklist, OPHRP provided a negative answer as to "any changes in facilities and/or site location" and then reaffirmed that "the 6(f)(3) boundary established in the pre-approval stage [had] been reaffirmed with the project sponsor" and that "the sponsor (State agencies or locals) [had] been told (verbally and in writing) what a 6(f)(3) boundary is and the implication of conversion of use."

In addition to these certifications that OPRHP understood the ramifications of a § 6(f)(3) boundary and which affirmed the specific boundary to be applied to the LWCF grant for EFFSP, the grant agreement also contained clear and unambiguous language binding OPRHP and NPS in accordance with the relevant statutes, regulations, and provisions of the Manual. Pointedly, the agreement provided that LWCF protection applies to "the property described in the project agreement and the signed and dated project boundary map . . . in perpetuity" unless an approved conversion process occurs. All of these critical documents were signed by at least one, and often two, OPRHP officials. Furthermore, none of the materials submitted by OPRHP and the City in

23

their revisionist review of their past institutional states of mind from nearly a decade ago, which were relied upon by NPS in its February 2011 decision, were part of the administrative record of the LWCF grant when it was applied for, approved, and closed out. There is, accordingly, not a shred of evidence in the record to suggest that OPRHP or NPS blundered in some sort of oversight or mistake by including the Tobacco Warehouse and Empire Stores on the original 6(f)(3) boundary map. Bluntly, the record convincingly suggests just the opposite — that the inclusion of the structures was entirely intentional. And, why not? It is also clear that the site was operated holistically and exclusively as a park and recreation area by OPRHP both before and after the grant period. In fact, it is uncontested that in 2002 while the grant was still open, OPRHP stabilized the Tobacco Warehouse and opened it to the public for both programmed events as well as unstructured activities. OPRHP's actions were not accidental — they were clearly for the purpose of allowing public recreation in the outdoor space of the Tobacco Warehouse, whether that recreation took the form of a dance class, strolling, or children building Frosty the Snowman.[14]

Particularly when viewed against the clear evidence from the administrative record of the LWCF grant process, the December 2008 decision appears untenable.[15] The entire record for the December 2008 decision, as noted above, consists of two letters, each barely over a page in length: the November 5, 2008 letter from OPRHP to NPS, and the December 12, 2008 NPS decision itself. The OPRHP letter states only that the "practice" of mapping an "entire park . . .

---

[14]   As for Empire Stores, it is clear from the record that OPRHP began using it for both administrative office space as well as public restrooms for EFFSP around the same time.

[15]   The February 2011 decision claims to supersede the December 2008 decision. But since the 2011 decision only resulted from BHA's "informal appeal" of the 2008 decision — and as the 2008 decision was incorporated whole hog into the 2011 decision — the former still seems relevant to this action.

pursuant to section 6(f)" has "created difficulties," and that at that time, the "former warehouse buildings are not suitable for nor used by the public for outdoor recreational opportunities in the park." NPS relied on these assertions without confirming or even investigating them or requesting any additional information or public comment. The decision notes that "[a]ccording to the project file, it appears that when the project was approved, and later Closed, both NPS and OPRHP inadvertently overlooked the existence of four warehouse buildings located within the project boundary," an explanation that was flatly contradicted by the contents of the project file itself. More troubling still, NPS accepted OPRHP's bare assertion of unsuitability and regurgitated it in a revisionist finding of its own: "since . . . these former warehouses are not suitable for recreational use by the public, the pre-existing warehouses should have been excluded." Especially given the vital importance of the § 6(f)(3) protection of LWCF-assisted property, the contrary 2008 decision was based on an invisible record, and, in a sweeping action, "entirely fail[ed] to consider an important aspect of the problem." Nat'l Ass'n of Home Builders, 551 U.S. at 658. Plaintiffs, therefore, have demonstrated a clear and substantial likelihood of success on the merits on their claim that the 2008 NPS decision, either on its own or as incorporated into the 2011 NPS decision, should be set aside pursuant to the APA.

The February 2011 decision, in the end, cut from the same cloth, fares no better. Once again, NPS determined that the original inclusion of the historic structures on the 6(f)(3) boundary map was "a correctable mistake." Even "based on a [slightly] fuller record,"[16] this

---

[16] This record was primarily based on submissions by OPRHP and the City, including, in particular, planning documents and proposals for BBP, the Tobacco Warehouse, and Empire Stores. The consideration of and reliance on these documents appears to be completely beyond the scope of any inquiry NPS was empowered to undertake, as discussed infra. Moreover, even if those documents were properly considered, NPS seemingly cherry-picked the documents that favored upholding its 2008 decision — including, especially, third-party proposals for the Tobacco Warehouse and Empire Stores that were, for the most part, never

conclusion is contrary to the evidence and, additionally, "relied on factors which Congress had not intended [NPS] to consider." Id. Equally problematic is the clear likelihood that both NPS decisions are contrary to the statutory provisions of the LWCFA and the regulations that govern its application. In short, there is no provision in § 6(f)(3), nor in 36 C.F.R. Part 59, that allows for the "technical correction" procedure self-originated and employed by NPS here, even given, as the Court must, a deferential treatment of NPS's interpretations of those provisions. First, even if it is assumed arguendo that, under the Chevron doctrine, the language of § 6(f)(3) is "silent or ambiguous with respect to the specific issue" here, it appears unlikely that NPS's interpretation of that language "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. Section 6(f)(3) states that "[n]o property acquired or developed with assistance under this section shall, without the approval of the Secretary [of the Interior], be converted to other than public outdoor recreation uses." 16 U.S.C. § 460*l*-8(f)(3). There is no question, of course, that EFFSP was developed with assistance under the LWCFA; the question is what constitutes a "conver[sion] to other than public outdoor recreation uses."

NPS argues that because the Tobacco Warehouse and Empire Stores were not suitable or intended for "public outdoor recreation uses" at the time of the grant, they should not have been included in the 6(f)(3) boundary, and thus removing them from within that boundary is a correction rather than a conversion. In effect, NPS contends that if part of an LWCF-assisted property was not used or intended for public outdoor recreation, notwithstanding its inclusion on the 6(f)(3) boundary map, its subsequent removal from the map cannot be deemed a conversion.

---

adopted let alone put into action, and which are irrelevant in any event. Only the State's planning documents have even the remotest claim to relevance, and all of the actual BBPDC planning documents and maps of the future BBP prior to 2003 (and even as late as 2007) include the two structures, often labeling or describing the Tobacco Warehouse as a "walled garden" and envisioning another garden on the roof of Empire Stores. In short, NPS's "fuller record" still appears entirely unavailing.

This interpretation of the statute, however, was specifically rejected by the Second Circuit in _Friends of the Shawangunks, Inc. v. Clark_, 754 F.2d 446 (1985). In _Shawangunks_, the district court had held that because the public was not actually using the land in question for outdoor recreation and the land was "not intended for outdoor, public, or recreational use," its development into a private golf course was not a conversion under section 6(f)(3). _Shawangunks_, 754 F.2d at 449 (quoting _Friends of the Shawangunks, Inc. v. Clark_, 585 F. Supp. 195, 200 (N.D.N.Y. 1984)). The Second Circuit reversed, "interpret[ing] section 6(f)(3) 'public outdoor recreation uses' broadly, to encompass uses not involving the public's actual physical presence on the property." _Shawangunks_, 754 F.2d at 449. In particular, the court found that "by exposing scenic vistas and serving as a buffer zone between [the] State Park and developed areas," the property in question served a public outdoor recreation use. _Id._ Here, the Tobacco Warehouse and Empire Stores serve an analogous function, albeit in the context of New York City, by adding to the scenic character of the park and serving as a buffer between the waterfront parkland and the commercially developed DUMBO neighborhood (to say nothing of the actual public outdoor recreation use inside the Tobacco Warehouse and the public restroom and park administration offices located at Empire Stores). Indeed, BBPC itself markets the appeal of Empire Stores and the "iconic" Tobacco Warehouse as "Points of Interest" to draw visitors to the park.

_Shawangunks_ eliminates the safe harbor in which NPS seeks refuge. The agency has twice concluded that the Tobacco Warehouse and Empire Stores were, in effect, "not intended for outdoor, public, or recreational use" _Id._ (quoting _Shawangunks_, 585 F. Supp. at 200). In particular, the February 2011 decision relied heavily on the determination that "the State never intended prior to the grant completion to commit to use the Tobacco Warehouse solely for public

outdoor recreation." Yet, powerfully, the *intended use of the structures* is not relevant, much less controlling, under the Second Circuit's interpretation of section 6(f)(3).

Furthermore, the record unmasks the NPS decisions as contrary to its own regulations, which demonstrably support the position that the Tobacco Warehouse and Empire Stores were properly placed on the 6(f)(3) boundary map and that any change to that map removing them constitutes a conversion requiring New York to consider alternatives and to provide substitute parkland. The February 2011 decision notes that "LWCF funds were not utilized to stabilize the [Tobacco Warehouse]," but that consideration is also irrelevant. See 36 C.F.R. § 59.1 ("These post-completion responsibilities apply to each area or facility for which Land and Water Conservation Fund (L&WCF) assistance is obtained, *regardless of the extent of participation of the program in the assisted area or facility . . .*") (emphasis added). Moreover, § 59.1 plainly indicates that some property may be included within the 6(f)(3) boundary despite not receiving LWCF assistance. Id. ("In many instances, this mutually agreed to area exceeds that actually receiving L&WCF assistance so as to assure the protection of a viable recreation entity.") The Manual also allows LWCF assistance for certain "eligible support facilities," including "support facilities needed by the public for outdoor recreation use of an area," such as "restroom buildings," as well as "[f]acilities that support the operation and maintenance of the recreation resource on which they are located are eligible, such as maintenance buildings" and "administrative offices." Manual at 3-13. NPS regulations make it clear that a 6(f)(3) boundary may protect properties — including not only the Tobacco Warehouse but also Empire Stores, with its OPRHP office space and public restrooms — that "support" or "assure the protection of" public outdoor recreation property without actually being used for public outdoor recreation themselves, entirely in harmony with Shawangunks.

28

Additionally, while both NPS decisions focus exclusively on the supposed mistake in the 6(f)(3) boundary map-making itself, § 59.1 provides that 6(f)(3) protection applies "to the area depicted or otherwise described on the 6(f)(3) boundary map *and/or as described in other project documentation approved by the Department of the Interior.*" 36 C.F.R. § 59.1 (emphasis added). Here, the project description submitted by OPRHP and approved by NPS specifically includes "[t]he Empire Stores/ Tobacco Warehouse complex," contradicting any determination that the inclusion of those structures within the 6(f)(3) boundary was somehow a mistake or oversight.

Beyond that, more importantly, the LWCF regulations contain no allowance for a "revision" or "correction" to a 6(f)(3) boundary other than through the conversion process. The statute is not silent about revisions; it flatly contradicts the NPS claim of power to correct "oversights" after a grant closes. *Any* change to the 6(f)(3) boundary after the close of an LWCF grant — regardless whether that change is referred to as a "revision" or "correction" — triggers the conversion process and requires the full consideration of alternatives and, if needed, the substitution of a replacement property. See 36 C.F.R. § 59.3(a) ("This section of the Act assures that once an area has been funded with L&WCF assistance, it is continually maintained in public recreation use unless NPS approves substitution property of reasonably equivalent usefulness and location and of at least equal fair market value."); 36 C.F.R. § 59.3(d) ("Changes to other than public outdoor recreation use require NPS approval and the substitution of replacement land in accordance with section 6(f)(3) of the L&WCF Act and paragraphs (a) through (c) of this section.") This interpretation of the LWCF regulations is buttressed by NPS's own LWCF Manual. The Manual indeed anticipates that some corrections or amendments to a § 6(f)(3) boundary might be necessary, *but only before* the close of the LWCF grant:

> An acceptable Section 6(f) map is required for all development and combination projects prior to NPS approval... NPS will contact the State about any needed changes to the map...
>
> Prior to the date of final reimbursement for development and combination projects, the State and NPS may mutually agree to alter the Section 6(f) boundary to provide for the most satisfactory unit intended to be administrated under the provisions of Section 6(f)(3)...
>
> *No changes may be made to the 6(f) boundary after final reimbursement unless the project is amended as a result of an NPS approved conversion.*

Manual at 6-3 (emphasis added). Thus, NPS's statements justifying changes to 6(f)(3) boundaries in order to correct errors — first in its December 2008 decision that "no changes [may] occur[] unless there is a conversion or significant error," and then in its February 2011 decision that "over time, regional staff have approved limited, technical corrections to the 6(f) boundary where they determined there was, in fact a significant mistake in how the boundary was mapped" — are contrary to the most deferential interpretation of NPS's own regulations. Whatever the nomenclature, any map change after the close of a grant requires adherence to the ordinary conversion process mandated by statute and regulation. Any circumvention of the statutory regime, for the sake of expedience or otherwise, will deprive the public of what Congress intended it to have: replacement property of equal value to *any* property removed from a 6(f)(3) boundary map after the close of a grant. Accordingly, plaintiffs show a clear and substantial likelihood of success on the merits of their LWCFA and APA claims on this score as well.

### 3. Inherent Residual Authority to Reconsider Final Agency Actions

NPS makes a last gasp argument in opposition to plaintiffs' LWCFA and APA claims, namely, that an agency possesses inherent residual authority to reconsider its own actions. This argument holds no water. It is true that "an agency may, on its own initiative, reconsider its

interim, or even its final decisions." Dun & Bradstreet Corp. Found. v. U.S. Postal Serv., 946 F.2d 189, 193 (2d Cir. 1991). It is also true that "[t]his rule applies 'regardless of whether the applicable statute and agency regulations expressly provide for such review,'" Chao v. Russell P. Le Frois Builder, Inc., 291 F.3d 219, 229 n.9 (2d Cir. 2002) (quoting Dun & Bradstreet, 946 F.2d at 193), "*but not* where there is 'contrary legislative intent or other affirmative evidence.'" Chao, 291 F.3d at 229 n.9 (emphasis in original) (quoting Bookman v. United States, 453 F.2d 1263, 1265 (Ct. Cl. 1972)). The case relied upon by NPS for this proposition, Macktal, also contains this key limitation. See Macktal v. Chao, 286 F.3d 822 (5th Cir. 2002) ("This is not a case in which the agency acted contrary to a statutory mandate limiting further review of an agency order.")[17]

At bar, there *is* "contrary legislative intent or other affirmative evidence," Chao, 291 F.3d at 229 n.9, in the form of 16 U.S.C. § 460*l*-8(f)(3), 36 C.F.R. §§ 59.1 and 59.3, as well as the LWCF Manual. All of these authorities are in accord with the original intent of Congress to place a high level of protection on LWCF-assisted properties in order to ensure the growth and vitality of public outdoor recreational resources for all Americans — and, consequently, to require that, if a State removes federally-assisted properties from public enjoyment, it shall consider alternatives and, if necessary, add other equivalent properties in their stead. See, e.g., 36 C.F.R. § 59.3(a) ("Section 6(f)(3) of the L&WCF Act is the cornerstone of Federal compliance efforts to ensure that the Federal investments in L&WCF assistance are being maintained in public outdoor recreation use."). Indeed, the subject NPS decisions both recognize and acknowledge the centrality of § 6(f)(3) to the LWCFA regime; the February 2011 decision

---

[17] The case relied upon by BBPC on this point, Eifler v. Office of Workers' Compensation Progs., 926 F.2d 663 (7th Cir. 1991), also decided the question of inherent authority absent any contrary legislative intent or other affirmative evidence. Id. at 666. In any event, the Court is bound to follow the Second Circuit precedents of Chao and Dun & Bradstreet.

declares that "Section 6(f) is the lynchpin of the LWCF State and local assistance program." Far from silent, the legislative and regulatory authorities speak loudly and clearly that changes to the 6(f)(3) boundary, after the close of a LWCF grant, are impermissible absent adherence to the conversion process. Ultimately, NPS has asked the Court to recognize its inherent residual authority to sidestep the "cornerstone of Federal compliance efforts" established by the very statute that authorized the grant to New York in the first place. It is a position that proclaims the agency's right to disregard the procedural requirements imposed on it by Congress and its own regulations.

Finally, even assuming arguendo that § 6(f)(3) and its enabling regulations do not constitute "contrary legislative intent or other affirmative evidence" vitiating NPS's purported authority to reconsider 6(f)(3) boundaries, NPS's authority would still be limited in the instant case, given the untimeliness of the reconsideration. Assuming the existence of such residual authority, an agency may use such authority to reconsider decisions "only if it does so within a reasonable time period." Dun & Bradstreet, 946 F.2d at 193; see also Bookman, 453 F.2d at 1265 (allowing reconsiderations "as long as the administrative action is conducted within a short and reasonable time period"). The calculation of "a short and reasonable time period will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years." Gratehouse v. United States, 512 F.2d 1104, 1109 (Ct. Cl. 1975); see also, e.g., Belville Min. Co. v. United States, 999 F.2d 989, 997-1000 (6th Cir. 1993) (allowing reconsideration after eight months); Friends of Iwo Jima v. Nat'l Capital Planning Comm'n, 176 F.3d 768, 775 n.4 (4th Cir. 1999) (seven months); Bookman, 453 F.2d at 1264 (four months); but see Dun & Bradstreet, 946 F.2d at 194 (declining to agree at the Rule 12 stage that five months was a reasonable time period for reconsideration and holding that reasonability would "turn on,

among other things, the complexity of the . . . decision, whether the decision was factually or legally based, and whether the [agency] acted according to its general procedures for review"). Manifestly, there is no question as to the untimeliness of NPS's purported reconsideration — the EFFSP grant closed in September 2003, and NPS did not issue its first decision redrawing the map until December 2008, over five years later, and over seven years after the grant was initially approved. While there may be considerable room for debate as to the limits of the reasonableness of an agency's reconsideration of a decision five to seven months after the fact, there is no doubt that five to seven years is far too long.[18] All of this, of course, adds to the substantial likelihood that plaintiffs will succeed on the merits.

## III.    CONCLUSION

For the foregoing reasons, plaintiffs' motion is granted, and an injunction is entered and shall remain in effect for the pendency of this litigation, to the following effect:

IT IS ORDERED that the December 12, 2008 and February 14, 2011 decisions of NPS regarding the revision and/or correction of the § 6(f)(3) boundary map for grant 36-01225 for Empire Fulton Ferry State Park are set aside; and it is further

ORDERED that the § 6(f)(3) boundary map for grant 36-01225 for Empire Fulton Ferry State Park be restored to the version originally submitted on October 17, 2001, as reflected on page 160 of the administrative record; and it is further

ORDERED that defendants, their agents, servants, employees, and all persons acting in concert with them or under their direction who receive actual notice of the injunction, are

---

[18]    Moreover, "[a]n agency's inherent authority to reconsider its decisions" is also limited by the requirement that such reconsideration not be "arbitrary, capricious, or an abuse of discretion" under the APA.  Macktal, 826 F.3d at 286.  As discussed supra, there is a substantial likelihood that NPS's actions would run afoul of the APA standard, representing another impediment to the exercise by NPS of any residual authority to reconsider the 6(f)(3) boundary map at issue.

enjoined from undertaking any drilling, boring, or other alteration or construction on the Empire Fulton Ferry Park site in connection with any use of the Tobacco Warehouse or Empire Stores, including, but not limited to, the movement or operation of any construction equipment into or in the immediate vicinity of the Tobacco Warehouse or Empire Stores.

SO ORDERED.

Dated: Brooklyn, New York
April 8, 2011

s/ENV

ERIC N. VITALIANO
United States District Judge